McCann, John S., J.

INTRODUCTION

William D. Strecker (Strecker as an individual) and Nancy W. Strecker (William and Nancy collectively together as Streckers) are at present represented by Tyler E. Chapman, Esq.[2] Mary Tavares as Trustee of RFS Realty Trust (Tavares)[3] and Francis Sutula (Sutula as individual) (and Tavares and Sutula together referred to herein as Tavares/Sutula) are represented by Donald J. Kaiser, Esq. Sheriffs Meadow Foundation (SMF) is represented by Lisbeth Jones, Esq.

OVERVIEW

The various disputes in all of these various cases arise out of two contiguous eight +/- acres of water view parcels referred to throughout this memorandum as Lot Nos. 17 (owned by Tavares) and 18 (owned by the Streckers). The disputes involve multiple actions in both the Superior Court and Land Court, cross-actions and/or counterclaims for declaratory relief, and injunctive relief involving two easements as well as claims for damages and attorneys fees[4] and two Complaints for Contempt.
There are a number of claims involved. They are basically the following, and are not necessarily in the same order of the various actions as they were filed in court: The first claim involves a driveway access easement emanating from a common driveway allowing access to both lots from Lamberts Cove Road, the easement being located on Lot No. 17 (the servient estate) and allowing access to Lot No. 18 (the dominant estate).
The second claim involves a walkway easement to the beach allowing access from Lot No. 18 (the dominant estate) over the other lot (Lot No. 17 the servient estate) to a public beach; and the remaining claims involve various collateral claims for injunctive relief and for related issues and damages arising out of those respective easements.
There are also two Complaints for Contempt pending in Dukes County Superior Court Docket No. 2002-00044, the first filed in 2006; and a recent complaint for Contempt filed November 26, 2007, the latter of which is presently pending subject to a hearing on that complaint.
All matters, except the second Complaint for Contempt, came before this Court as a juiy-waived trial on the various complaints. The first Complaint for Civil Contempt emanated out of a Court Order issued in Dukes County Superior Court Docket No. 2002-00044 by Garsh, J., on August 6, 2002, which complaint for Contempt arose out of the original of all of these actions, Dukes County Docket No. 2002-00044.
The Order of the various cases and the Contempts as filed in the two Court Departments is the following:

(1) DUKES COUNTY SUPERIOR COURT DOCKET NO. 2002-00044 Strecker v. Tavares/Sutula) (Tavares/Sutula counterclaim v. Strecker) and (Tavares/Sutula v. Strecker Contempt)

[5]

This Superior Court Action filed in 2002 (the first action filed among the parties) is in the following seven counts alleged in Streckers’ Amended Complaint:[6] (I) declaratory relief whereby Streckers seek to establish a valid entrance to an easement across Tavares’ property for access to a pathway to the beach which is established on the ground but not within a presumed deeded easement as shown on Land Court Plan No. 20774G (this will be referred to throughout as the “upper pathway entrance,” and depicted on Exhibit *686 No. 2); (II) trespass by Tavares/Sutula’s installation of a fence over property line of Streckers (referred to as “Sutula fence” and depicted on Exhibit No. 2); (III) breach of contract and/or implied covenant; (IV) fraud and misrepresentation; (V) estoppel; (VI) violation of G.L.c. 242, §7 destruction of trees plus treble damages; (VII) declaratory relief in regard to a dispute relating to (i) location of entrance to pathway ie: at the concrete bound, the “upper pathway entrance” or fifty feet westerly from said concrete bound (the latter being referred to as “lower pathway entrance” depicted on Exhibit No. 2); (ii) costs of maintenance of beach walkway depicted on Exhibit No. 2, and driveway depicted on Exhibit No. 1; (iii) costs for relocation of the first driveway (this will be referred to as the “pre 2003 driveway”[7] and relocation to the “post 2003 driveway,”[8] both depicted on Exhibit No. 1; (iv) common driveway rights, (v) costs of the footbridge (at “the lower pathway entrance” depicted on Exhibit No. 2); (vi) passageway to the beach beyond footbridge depicted as “D” pathway on Exhibit No. 2; and (vii) rights of subsequent owners to Lot No. 18.
Streckers’ prayers for relief seek the continued use of the walkway easement as it presently exists and shown as “C” pathway and depicted on Exhibit No. 2, the “upper pathway entrance”; damages; and declaratory judgment establishing the location of the entryway to the beach pathway and determination of costs relating to the footpath, beach walkway, and the driveway.
An amended answer was filed by Tavares/Sutula. It is essentially a general denial. Tavares/Sutula also filed four affirmative defenses: (1) failure to state a claim; (2) estoppel; (3) unclean hands; and (4) laches. Tavares/Sutula requested the complaint of Streckers be dismissed and that they, Tavares/Sutula, be awarded damages under G.L.c. 231, §6F, on the basis of the Streckers filing a frivolous claim.
Tavares/Sutula also filed an Amended Counterclaim against the Streckers in five counts: (I) trespass (over the “upper pathway entrance" from Lot No. 18 as shown on Exhibit No. 2); (II) trespass by virtue of Streckers’ acts of expansion of driveway (from the “pre 2003 driveway” to the “post 2003 driveway” both shown on Exhibit No. 1), destruction of trees, plant life in the driveway area (the “post 2003 driveway” area); destruction of beach grasses; erosion of trees and woods in walkway (“lower pathway entrance” to Lot No. 18 shown on Exhibit No. 2) and treble damages; (III) damages for excessive use of driveway easement by Streckers; (IV) damages for Streckers’ continued trespass on driveway (“post 2003 driveway”) and walkway easements i.e. outside of granted easement areas as shown on Land Court Plan No. 20774G (“upper pathway entrance” to Lot No. 18); and (V) damages for shared costs of walkway and driveway easements.
The relief sought in the Amended Counterclaim by Tavares/Sutula against the Streckers seeks damages for loss of enjoyment and use of home, treble damages for loss of trees, wood and vegetation, denial of right to existing pathway and driveway easements to Streckers except as shown on Land Court Plan No. 20774G by way of injunctive relief.
Ultimately, and as a result of the Order of Interdepartmental Transfer and Consolidation issued by Chief Justice Robert A. Mulligan, the Land Court Action No. 04SBQ20774G5001 (which order will hereinafter be referred to and more fully explained) was transferred to Dukes County and incorporated into this Superior Court action in its entirety by virtue of the fact that the whole Land Court Case Docket No. 04SBQ20774G5001 was docketed and filed in this Superior Court action as one docket entry, Paper Number 41, by clerical action. It would seem that under the rules, it should have more properly been transferred to Dukes County, assigned a separate and distinct Superior Court docket number, and then have been administered independently, and by way of consolidation as two separate cases under the Interdepartmental Transfer Order. But, with that having been said, under the Interdepartmental Order, this Court must deal with each case as this Court finds them.[9]

(2) 2006 [FIRST! COMPLAINT FOR CIVIL CONTEMPT IN SUPERIOR COURT COMPLAINT NO. 2002-00044 (Tavares/Sutula v. Streckers, Contempt Complaint)

The Complaint for Civil Contempt filed on October 30, 2006 is in one count brought by Tavares/Sutula against the Streckers for violation of the August 6, 2002 Court Order of Garsh, J. The Streckers, plaintiffs in the original action, were denied relief on their original Complaint seeking Injunctive Relief On the Counterclaim by Tavares/Sutula, the Streckers as defendants-in-counterclaim, were enjoined from entering Lot No. 17 on the “upper pathway entrance” as it then existed, except within the boundaries of the walkway easement as shown on Land Court Plan No. 20774G. The Complaint for Contempt alleges that the Streckers violated, and continue to violate that Order. Tavares/Sutula seek a finding of contempt, the issuance of a permanent injunction, sanctions and fines for failure of Streckers to comply with the Preliminary Injunction of Garsh, J.
(3) LAND COURT DOCKET NO. 04SBQ20774 05 001[10] (Streckers v. Tavares/Sutula and Sheriff’s Meadow Foundation [an Interested Party])
The 2004 Land Court Complaint filed by the Streckers against Tavares/Sutula and Sheriffs Meadow Foundation (SMF) is in the following four counts in what is referred to as an Amended Supplemental Complaint:[11] (I) declaratory relief to establish the walkway easement to the beach as it presently exists on the ground as depicted on Exhibit No. 2; (II) declaratory relief to determine rights in the “post 2003 driveway” as depicted on Exhibit No. 1; (III) (no count *687 III alleged); (IV) declaratory relief in regard to utility-easement in the driveway to establish it in the “post 2003 driveway” as reconstituted, as well as an easement from the Lambert’s Cove Road area, and in addition, from the electric box adjacent on Lot No. 17 to the boundary of Lot No. 18. SMF was simply named as an interested parly.[12]
The Streckers seek the following relief in regard to this Land Court Complaint: amend the title to relocate the driveway from the “pre 2003 driveway” location to the “post 2003 driveway” location; establish the newly relocated driveway, “the post 2003 driveway” as complying with the granted driveway easement as shown on Land Court Plan No. 20774G and instruments of record; enjoin obstruction of the use of the “post 2003 driveway” by Tavares /Sutula; enjoin Tavares/Sutula from distribution of trash, debris and rocks on the Tavares/Sutula side of the property line; establish or reestablish the utility easement within the “post 2003 driveway”; amend the certificate of title to implement a utility easement in the “post 2003 driveway” and its extension ends that are not necessarily covered in the proposed driveway easement shown on Land Court Plan No. 20774G.
Tavares/Sutula filed a Motion to Dismiss the Streckers’ Complaint. Consequently, no answer and no affirmative defenses were initially filed in this Land Court action and the Motion to Dismiss is a pending dispositive motion.
No response was filed by SMF as an Interested Party although an appearance was filed by counsel, Lisbeth Jones, Esq. This Court determines that SMF was not required to file an answer, but by the appearance of counsel, Lisbeth Jones, Esq., on behalf of SMF, these findings and judgment shall be binding upon SMF because it filed an appearance in this action as an Interested Party. (See footnotes 10 and 12 on pages 8 and 9 respectively.)

(4) LAND COURT DOCKET NO. 06MISC330647 ■ SCHEIER (Tavares v. Streckers)

The 2006 Land Court Action No. 06MISC330647 SCHEIER brought by Tavares[13] against the Streckers is in one count seeking declaratory judgment to relocate the driveway easement reconstructed by the Streckers back from the present “post 2003 driveway” location to the “pre 2003 driveway” location to where it was originally constructed by Tavares/Sutula and maintained between 1995 and 2003. Her prayers seek a declaration for relocation of the driveway to the location of the “pre 2003 driveway” which is outside of the deeded driveway easement as shown on Land Court Plan No. 20774G; the registration of a plan to implement the change to the “pre 2003 driveway” location; an enforcement of the driveway easement to compel the Streckers to use the “pre 2003 driveway location”; and injunctive relief enjoining Streckers from blocking the driveway easement as further reconstituted to the “pre 2003 driveway location”; and limiting the easement to vehicular and walking traffic only.
A Motion to Dismiss was filed by Streckers. No answer nor affirmative defenses were filed. Tire Motion to Dismiss is a pending dispositive motion. This Court now deems that Motion to Dismiss moot because in the next case to be discussed, Dukes County Superior Court DUCV2007-00011-A, this Land Court Action was transferred to the Superior Court, acquired a separate Superior Court Number, and in which responsive pleadings were filed.

(5) DUKES COUNTY SUPERIOR COURT NO. DUCV2007-00011-A (Tavares v. Streckers) and (Streckers v. Tavares/Sutula - Counterclaim [Land Court No. 06MISC330647 SCHEIER])

The 2007 Superior Court Action consists of the Land Court Action 06MISC330647Scheier which was transferred to the Superior Court by the Interdepartmental Transfer Order of Chief Justice Mulligan.[14] As a result, the Land Court case pleadings became the total basis of this 2007 Superior Court pleadings by virtue of the fact that, under the rules, the case was transferred, and assigned a separate Superior Court number for purposes of the administration of the case. Therefore the Complaint in that Land Court case, which is referred to as a Supplemental Complaint[15] is the primary complaint in the 2007-00011-A Superior Court case. The whole Land Court file became Paper No. 1 in Dukes County Superior Court Docket No. 2007-00011A.
The Order from Chief Justice Mulligan refers to only three cases, but because the original Land Court Docket No. 06MISC330647 SCHEIER ultimately became Dukes County Superior Court Docket No. DUCV 2007-00011-A simply by a clerical or an administrative action, this Court construes this latter action to be clearly within the parameters of the Order of Chief Justice Mulligan.
Notwithstanding the Motion to Dismiss in the original Land Court action, in this latter Land Court/Superior Court action Streckers filed an answer of general denial and the following fifteen affirmative defenses: (1) failure to state a claim; (2) justification; (3) no damages; (4) waiver; (5) failure to exhaust administrative remedies; (6) vague pleadings in violation of Mass.R.Civ.P. 8(e)(1); (7) Tavares barred by wrongful conduct of husband Sutula; (8) unclean hands; (9) laches; (10) mootness; (11) failure to provide sufficient survey; (12) Tavares barred by inability to establish driveway easement; (13) relocation of driveway easement increases burdens on Streckers; (14) frustration of purpose for which easement created; (15) G. L. c. 231, §6F frivolous lawsuit. Because of these filings, this Court therefore deems the Motion to Dismiss in the original Land Court Case Docket No. 06MISC330647 SCHEIER moot as waived by virtue of the pleadings.
*688 Streckers filed a counterclaim in the following two counts (naming not only Tavares but adding Sutula as a party defendant in the counterclaim):[16] (I) declaratory relief to establish the location of both the walkway and the driveway easements; to mandate Streckers and Tavares/Sutula to mutually agree on a design for trail improvements; and to reimburse the Streckers for costs and legal fees; and (II) a permanent injunction enjoining interference by Tavares/Sutula with the Streckers’ use of existing walkway easement, the “upper pathway entrance” to the walkway, and the “post 2003 driveway” as reconstituted by the Streckers.

Interdepartmental Order of Chief Justice Robert A. Mulligan

On January 5, 2007, Chief Justice Mulligan ordered that the Justice of the Superior Court Department sitting in Dukes County Time Standard “A” session be assigned to sit in the Land Court Department for purposes of hearing the Land Court cases herein after referred to, and to sit simultaneously as a Judge of the Superior Court and the Land Court to further the orderly processing of each of the following matters:
Mary Tavares v. William D. Strecker, Land Court Department No. 06MISC330647 William D. Strecker v. Mary Tavares, Land Court Department No. Reg. 20774 S 2004 05-001 A [04SBQ20774 05 001).
William D. Strecker et aL v. Mary Tavares, Trustee of RFS Trust et aL, Dukes County Superior Court Department No. DUCV2002-00044.
The order from Chief Justice Mulligan further provided that “(t]he matters remain separate actions pending in different Departments of the Trial Court and as such findings, as may be appropriate as well as judgment are required in each action.”[17] This Justice, McCann, J., was assigned to that session and heard these various cases. The Interdepartmental Order will be referred to hereinafter in the Rulings of Law section on page 66 under the discussion of Fusion.

(6) 2007 [SECOND] COMPLAINT FOR CIVIL CONTEMPT IN SUPERIOR COURT COMPLAINT NO. 2002-00044 (Tavares/Sutula v. Streckers, Contempt Complaint)

The Second Complaint for Civil Contempt brought on November 26, 2007, is in one count brought by Tavares/Sutula against the Streckers alleging that the Streckers violated the two Orders of McCann, J., dated May 31, 2007, and June 27, 2007. That matter is presently pending and has not been heard to date by this Court, although this Court has stayed all future proceedings pending the filing of this Memorandum of Decision.

LEGAL DISPUTES BETWEEN AND AMONG THE PARTIES

The disputes between or among the parties in these various actions revolve around numerous issues relating to both Lot Nos. 17 and 18 but more importantly, issues which may substantially affect subsequent record title holders to both lots. The disputes are the following:
(1) Whether the common driveway for Lot Nos. 17 and 18 should be established in the location of:
(a) the “pre 2003 driveway” location depicted as “A” driveway on Exhibit No. 1 (colored pink);
(b) the “post 2003 driveway” location depicted as “B” driveway on Exhibit No. 1 (colored blue); and
(c) relief to determine the width and use of the driveway.
(2) In regard to the Commonwealth Electric Company easement, whether it should:
(a) remain as established partly within the “post 2003 driveway” and partly without; or
(b) be removed and relocated entirely within the “pre 2003 driveway,” or entirely within the “post 2003 driveway,” or partly in each; and
(c) establish an easement for the entire utility lines over Lot No. 17.
(3) The location of the entryway to the beach walkway easement from Lot No. 18 to Lot No. 17 and whether it be established as:
(a) “upper pathway entrance” as depicted on Exhibit No. 2 (colored pink); or
(b) “lower pathway entrance” as depicted on Exhibit No. 2 (colored orange).
(4) The pathway from the entry point of Lot No. 18 over Lot No. 17 to the beach (or end of the Conservation Restriction area), and whether it be established:
(a) within the actual walkway easement as it presently exists on the ground, depicted as pathway “C” on Exhibit No. 2 (colored pink); or
(b) within the walkway easement as shown on Land Court Plan No. 20774G depicted as pathway “E” on Exhibit No. 2 (colored blue).
(5) The pathway for the westerly end of the boardwalk near the dunes to the beach area and whether it be established:
(a) as the pathway as shown on Land Court Plan No. 20774G adjacent to Coca Cola Brook and depicted as pathway “G” on Exhibit No. 1 (colored white and then blue); or
(b) as the path established by Sutula to the right of the so-called “locker box” and depicted as pathway “F” on Exhibit No. 2 (colored green).
(6) To establish and set forth the obligations of SMF as to the approval or disapproval of all of the matters under the Conservation Restriction or other instruments of record which may affect SMF *689 in regard to the construction of the houses, the driveway easement and the walkway easement, and all other work done to date on the properties in question.
(7) Whether the Streckers are in contempt of the Order of Garsh, J., dated August 6, 2002 (First Contempt); or the Orders of McCann, J., Dated May 31, 2007, and June 27, 2007 (Second Contempt).
The two Complaints for Contempt arises out of the counterclaim of Tavares/Sutula against the Streckers in the original Superior Court action initially brought by Streckers against Tavares/Sutula Superior Court Docket No. DUCV2002-00044. This Court construes these two Complaints for Contempt to be clearly within the parameters of the Interdepartmental Order of Chief Justice Mulligan as they both arise out of the original Superior Court Action No. DUCV2002-00044.
There are other numerous collateral matters which will be dealt with hereinafter, which this Court also construes to be within the parameters of the Order of Chief Justice Mulligan.

FACTUAL BACKGROUND

Both parties have submitted extensive requests for findings of fact and rulings of law in regard to each of the various cases. This Court does not respond specifically to any, but by these findings of fact and rulings of law, this Court considers its action to appropriately respond to the germane requests for findings of fact and rulings of law which were requested by all parties in each of the pending actions.
Upon all of the credible evidence before this Court and the reasonable inferences to be drawn therefrom, and upon the preponderance of the evidence, this Court makes the following findings of facts and rulings of law.
The Saga Establishing Two Lots for Peter R. Goethals; the Two Easements; and the Separate Transfers to Tavares and to Streckers[18]

Peter R. Goethals’ Division of Land

In the mid-1980s, Peter R. Goethals (Goethals) owned a large parcel of vacant land on Lambert’s Cove Road on Martha’s Vineyard. His brother, Thomas R. Goethals, Jr., owned a similar large tract of land contiguous to and to the east of Goethals’ land. Goethals’ other brother Henry W. Goethals, also owned a large tract of land contiguous to and to the west of Goethals’ land. Tie three Goethals brothers acquired title to the property from their mother who owned a large tract of land which originally consisted of all three lots. She eventually divided it essentially equally among the three brothers. The lots as originally construed were contiguous to each other with Goethals’ land being the parcel in the middle of the two lots of his brothers. Goethals’ lot is depicted as Lot No. 11 on Land Court Plan 20774E.
Goethals’ land originally consisted of 16.8 +/- acres. It abutted Lambert’s Cove Road to the south and a public beach, owned by the Town of West Tisbury, on Vineyard Sound to the north. Goethals’ property abutted the beach area owned by the Town of West Tisbury. The water view portion of the property abutted the Town beach and faced to the northwest.[19] The property had an unusual view of sunsets in the evening. The parcel consisted of a high area which eventually sloped down and dropped off into a wetland area. The wetland area then extended out toward a sandy dune area. Beyond the sand dune area is the large beach owned by the Town of West Tisbury, a public beach open only to the residents of West Tisbury, stretching way to the east and way to the west.[20] A brook drained in a basic direction of south to north, from Goethals’ upper land and running through a wetlands area, creating a small pond, referred to as Frog Pond. Frog Pond drained and eventually meandered though the dunes area, and emptied between the dunes, through or over the beach, and then into the ocean. The brook is sometimes referred to as Coca Cola Brook[21] or alternatively as Black Water Brook.
In the early 1980s the single lot owned by Goethals had been placed on the market by Goethals for approximately $1,000,000+/-. It did not sell at that price. Around 1985, Goethals consulted with Douglas Hoehn (Hoehn), a professional land surveyor on Martha’s Vineyard. Goethals’ purpose was to explore the possibility of subdividing his lot into two contiguous lots for the purpose of sale as two individual lots. Hoehn generated a working plan for Goethals. The working plan divided the larger lot into two single lots, one to the northeast and one to the southwest. The lot to the northeast would later become Lot No. 17 and eventually become the Tavares’ lot. The lot to the southwest would later become Lot No. 18 and eventually became the Streckers’ lot. The proposed lots had a common boundary line extending from Lambert’s Cove Road to the boundary of the Town of West Tisbury Beach.
Hoehn proposed to Goethals that he (Hoehn) create a walkway easement over Lot No. 17 beginning at approximately the midpoint of the common boundary ofLotNos. 17 and 18, and extending to the beach area. The purpose of the walkway easement was to allow Goethals, while he retained ownership of Lot No. 18, and then subsequent owners of Lot No. 18, to have access to the beach area by way of a deeded walkway easement. It was the opinion of both Goethals and Hoehn that beach access would enhance the value of both Lot Nos. 17 and 18, as each Lot would then have access to the public beach area of Lambert’s Cove even though the lots did not directly abut the ocean.
Although Lot No. 18 also abutted the town beach area, a separate pathway over Lot No. 18 to the beach was not practicable because of the contour of Lot No. 18, the configuration of the ponding area known as *690 Frog Pond in the wetlands portion of Lot No. 18, the configuration of the dunes on Lot No. 18, and the impact upon the lot considered an environmentally sensitive area.
Goethals retained Mark Rasicot (Rasicot) of the Vineyard Open Land Foundation[22] to assist in the application before the West Tisbury Conservation Commission (WTCC) in regard to the proposed walkway easement as well as a proposed driveway easement. It was Rasicot who also assisted in the design of the proposed driveway easement. Rasicot designed the driveway easement and the walkway easement, and Rasicot’s designs were eventually incorporated into the final plan developed by Hoehn on behalf of Goethals.
The single lot of Goethals was restricted to one driveway because of the then existing bylaw restrictions in the Town of West Tisbury. Hoehn, therefore, proposed to Goethals that he build a common driveway over Lot No. 17 which would enter at the common boundaiy line of Lot Nos. 17 and 18, and proceed in a westerly direction over No. Lot 17 until it extended to the approximate midpoint of the common boundaiy line of Lot Nos. 17 and 18. At that point the driveway would then truncate to the left so as to service Lot No. 18 but also serve as the driveway for Lot No. 17. Hoehn proposed that the common driveway portion be an easement over Lot No. 17 so as to'provide driveway access to Lot No. 18 over Lot No. 17.
Prior to Hoehn’s survey of the land for the purpose of developing the subdivision plan, Goethals filed a Notice of Intent (N.O.I.) with the WTCC to build a driveway from Lambert’s Cove Road to a culvert, the culvert being approximately 300+/- feet from Lambert’s Cove Road. Goethals also filed an application for a special permit with the West Tisbury Zoning Board of Appeals (ZBA) to obtain a curb cut for the proposed driveway at the entranceway of Lot Nos. 17 and 18 at Lambert’s Cove Road. The WTCC issued an order of conditions allowing a driveway from Lambert’s Cove Road to the culvert, but limited the actual driveway within the twenty-foot-wide driveway easement area to ten feet in width.[23] The ZBA issued the special permit allowing the curb cut and the driveway to the culvert.
In 1988, Goethals also consulted with an architect, Joseph Eldredge (Eldredge), as the plans were being developed, and requested that Eldredge prepare a N.O.I. in regard to the division of his single lot into two lots. Goethals expressed that he wanted to preserve the environmental features of his land and follow conservation principles, which ultimately led to a Conservation Restriction for the benefit of the local land trust SMF.
Eldredge located the access driveway and the beach access walkway based upon his review of the records, his knowledge of the property, and his visits to the property in connection with his work. From that, he assisted in the preparation of the N.O.I. filed in 1988 on behalf of Goethals with the WTCC for the purpose of dividing the single lot into two lots.
Hoehn proceeded to develop the proposed plan to divide the lots. As he did, Hoehn determined that because the property was Land Court properly, he was required to set and establish concrete bounds at a minimum of eveiy 500 feet so as to conform to the then existing Land Court requirements. As Hoehn and his crew were in the field and surveyed the common boundaiy between Lot Nos. 17and 18, he and his crew were unable to see or observe the area of the common boundaiy of Lot Nos. 17 and 18 in the area of the disputed walkway entranceway from the then used engineering angle point for a distance of five hundred feet due to the drop in elevation, the contour of the land, the flora and the basic topography.- He therefore set a concrete bound at a shorter distance, placing the concrete bound at a point 260 feet from the then used angle point, but within the 500-foot minimum requirement of the Land Court. This resulted in the concrete bound being placed approximately fifty feet southeast of the proposed beach path easement entiyway, or in other words approximately fifty feet closer to Lambert’s Cove Road. A key distinction is that the concrete bound was used to establish the common boundaiy line only between Lot Nos. 17 and 18, and not for the purpose of establishing an entry point to the walkway.
Hoehn did not notify Goethals, WTCC or SMF of this change in the location of the concrete bound. This Court finds that there was no request to notify any of the above, nor was there any obligation to do so.
Eventually, a plan was developed by Hoehn for Goethals for the purposes of filing with the Land Court. The plan consisted of a metes and bounds description of both Lot Nos. 17 and 18. However, it depicted only a sketched overlay of the proposed driveway easement and a sketched overlay of the proposed walkway easement, neither being defined by metes and bounds. The metes and bounds of these latter two easements were never developed by Goethals or by his engineers. As will be seen, this eventually became problematic among the various parties to these actions.
The plan which was eventually developed is entitled “Plan of Land in West Tisbuiy, MA dated June 24, 1991 being a subdivision of Land Court Plan No. 20774E, Lot 11 Schofield Brothers, Inc. Registered Professional Engineers & Land Surveyors, Owner: Peter R. Goethals, Certificate 6067,” and being Plan Reference No. 20774G. As discussed above, the plan depicts the driveway easement and the walkway easement as sketches and not by metes and bounds. The plan was filed and accepted by the Land Court on May 11, 1992, and is identified as Plan 20774G.[24]
In developing the plan, Hoehn simply used the plan previously developed by Eldredge for the 1988 N.O.I. as the basis for how Hoehn drew the easements on the *691 plan. He did not consult with the WTCC, with SMF, nor with Goethals regarding the location of either easement. The plan developing the two lots was not a subdivision plan requiring approval under the Subdivision Control Law because there was sufficient frontage for both lots on Lambert’s Cove Road for each lot to be established as an individual lot and therefore not be considered a subdivision. The ZBA had previously granted a Special Permit to construct a curb cut and the WTCC issued an order of conditions for a common driveway over a portion of Lot No. 18 so as to allow access to Lot No. 17. The Planning Board approved the plan as an ANR (Approval Not Required) plan.[25]
The driveway easement as shown on the plan depicts six different legs. The first five legs entering from Lambert’s Cove Road depict a twenty-foot wide driveway easement, within which legs is depicted a ten-foot wide dirt driveway.[26] In the sixth or final leg as shown on Land Court Plan No. 20774G connected to Lot No. 18, there is no such approximately ten-foot wide limitation. This final leg is instead depicted as a twenty-foot-wide driveway easement.
At the time that the Land Court Plan No. 20774G was filed, there were no accompanying documents filed with the Land Court referring to either the driveway or walkway easements. However, subsequent to the filing of the Land Court Plan No. 20774G, there were six separate documents filed with the Land Court which substantially affected each easement as well as both Lot Nos. 17 and 18.
They are the following:
(1) Conservation Restriction between Goethals and SMF approved by the Land Court on July 16, 1992, signed by Goethals on September 17, 1992, accepted by signature by SMF, approved by the Town Selectmen and also by the Office of Environmental Affairs, and recorded in the Land Court oil December 2, 1992;
(2) Deed from Goethals to Tavares dated October 26, 1992, and recorded December 2, 1992;
(3) Easement from Tavares to Commonwealth Electric Company dated March 31, 1993, and recorded December 29, 1994;
(4) Common Driveway Agreement between Goethals and Tavares dated October 2, 1995, and recorded October 25, 1995;
(5) Certificate of Acknowledgment of Payment by Tavares to Goethals dated October 19, 1995, and recorded October 25, 1995; and
(6) Deed from Goethals to Streckers dated October 2, 1995, and recorded October 25, 1995.
First: The first document is a Conservation Restriction. It is a grant of a Conservation Restriction from Goethals to SMF which substantially affected the use of a portion of each Lot Nos. 17 and 18, as well as the further establishment and use of the walkway easement. By the terms of the Conservation Restriction, Goethals, and his successors to title, are referred to as the “Grantor.” The obligations of the Conservation Restriction run with the title to both Lot Nos. 17 and 18, and therefore to Tavares as well as Streckers, both of whom are successors in title to Goethals.
Paragraph 2 of the Conservation Restriction grant from Goethals to SMF is entitled “Reserved Rights, ” and in subparagraph 2(f) provides in pertinent part:
2. (f) . . . installation, maintenance and use of a pedestrian trail, including necessary bridges and boardwalks, between the Building Zones and the beach over Easement Zone “A," approximately as shown on the sketch plan (Exhibit A) and as approved in writting by the grantee (SMF).
Again, the pathway as shown on Land Court Plan No. 20774G is not established by metes and bounds. The Conservation Restriction refers only to an approximate location, and not necessarily to the sketched location shown on Land Court Plan No. 20774G. The pathway, by its terms, also extends between the Building Zones and “the beach.” It is therefore not excluded by the “buffer zone” which will be hereinafter referred to.
SMF is a not for profit Massachusetts corporation located in Vineyard Haven, Massachusetts. It is aland conservation organization created to accept and enforce conservation restrictions granted to it. Goethals, individually and as Trustee under the revokable Trust of Peter Goethals dated June 26, 1990, executed the Conservation Restriction affecting both Lot Nos. 17 and 18. Goethals granted to SMF, and its successors and assigns, in perpetuity, and exclusively for conservation purposes, a restriction on certain land namely Lot Nos. 17 and 18. The grant of the Conservation Restriction excepted and excluded a 100-foot wide strip of land along the boundary line to the public beach area owned by West Tisbury. Notwithstanding, it did specifically provide for “a” pedestrian trail to the beach. It also referred to the trail as “approximately as shown” on the plan.
Goethals’ purpose, as stated in the Conservation Restriction, was common in purpose with SMF, which was to preserve a majority of the premises of both lots as open space and woodlands for the scenic enjoyment of the general public, to allow the premises to yield a significant public benefit by preserving the rural nature of Lambert’s Cove Road, a scenic road in West Tisbuiy, and to allow a view from Lambert’s Cove Town Beach.
The Conservation Restriction did not cover all of Lot Nos. 17 and 18. There are four portions to the Conservation Restriction affecting each lot and they are the following: (1) a “buffer zone” beginning at the Vineyard Sound side, at the boundary between Goethals’ lot and Lambert’s Cove Beach, a 100-foot-wide area on both Lot Nos. 17 and 18 to which the Conservation Restric *692 tion does not apply; (2) an easement zone “A” extending inland from the 100-foot buffer zone over both Lot Nos. 17 and 18 for approximately 600 feet and over which the walkway easement extends over Lot No. 17, the Tavares lot, to the boundary of Lot No. 18; (3) a building zone for each of Lot Nos. 17 and 18 extending further inland from the boundary of Easement Zone “A” approximately five hundred feet over which the common driveway extends over Lot No. 17, the Tavares lot, so as to allow access to Lot No. 18, the Streckers’ lot, from Lambert’s Cove Road; and (4) there is an easement zone “B” which then extends from the respective building zone boundaries on Lot Nos. 17 and 18 out to the boundaries of each lot on Lambert’s Cove Road.
The Conservation Restriction granted to SMF a perpetual conservation restriction within the meaning of G.L.c. 184, §31 and in pertinent parts provides as follows:
The grant of the restrictions in the Conservation Restriction to SMF was a perpetual Conservation Restriction within the meaning of G.L.c. 184, §31 and in further pertinent parts provides as follows (all emphases added by the Court):
1. Prohibited Activities . . .
(e)Use of motorized vehicles . . . except for cars, trucks and other vehicles, including construction vehicles, used for purposes permitted by this Conservation Restriction;
(g) Activities detrimental to drainage, flood control, water or soil conservation, water quality, or erosion control;
(i) Cutting, removing or otherwise destroying trees, grasses or other vegetation, except as specified in paragraph 2 below;
(j) Any other use of the Premises or activity which would materially impair significant conservation interests unless necessary for the protection of the conservation interests that are the subject of this Conservation Restriction
2. Reserved Rights. Notwithstanding anything contained in paragraph 1, the Grantor [Goethals and his successors in interest] reserves the right upon prior written notice to the Grantee [SMF] to conduct or permit the following activities on the Premises:
(a). . . Selective clearing for view enhancement for the houses, as approved in writing by the Grantee [SMF], shall be allowed on Easement Zone “A.”
(b) Selective cutting appropriate for ecological management, as approved in writing by the Grantee [SMF];
(c) Any activities designed to enhance the ecological or natural historical value of the Premises or to enhance the awareness of such values, including but not limited to the creation of footpaths, boardwalks and the placing of informative signs and benches, as approved in writing by the Grantee [SMF].
(d) Installation, maintenance and use (for all vehicular purposes that a public way may be used in the Town of West Tisbury) of a common driveway, and installation, maintenance and use of underground utilities, within the driveway right of way on Easement Zone “B” between the Building Zones and Lamberts Cove Road.
(e) The construction, use, maintenance, repair and replacement of one single-family house and one guest house on each of Lot 17 and Lot 18 as shown on Land Court Plan 20774G (such guest house may be separate from or attached to the main house, but shall in no event contain more than 1,200 square feet) within the area shown as Building Zone; the installation, use, repair and replacement of wells, septic systems, driveways, underground utilities and non-habitable structures such as garages and sheds for such structures within the area shown as Building Zone; landscaping for residential use within the area shown as Building Zone.
(f) Installation, maintenance and use of a pedestrian trail including necessary bridges and boardwalks, between the Building Zones and the beach over Easement Zone “A,” approximately as shown on the sketch plan (Exhibit A) and as approved in writing by the Grantee [SMF];
(g) The protection of the barrier beach\dune system using snowfence, signs or other appropriate measures and use of signs and fencing to preserve wildlife habitat as approved in writing by the Grantee;
(h) In the event that future erosion causes the dunes and beach to move inland into Easement Zone A,” recreational use of the beach within Easement Zone A’ shall not be deemed inconsistent with the purposes of this Conservation Restriction;
The exercise of any right reserved by the Grantor under this paragraph 2 shall be in compliance with the then current Zoning Bylaw applicable to the Premises, the Wetlands Protection Act (General Laws Chapter 131, Section 40) and all other applicable federal, state and local laws.
Handwritten on the first page of the Conservation Restriction is the following “Note: The restriction area herein referred to will not be shown on [the] approved plan [presumably Land Court Plan No. 20774G].’’ The fact that the Conservation Commission Plan was not incorporated into the Land Court Plan No. 20774G also became problematic in the relationship among the parties to these various cases, and therefore to future record title owners.
*693 In other words, the boundaries of the Conservation Commission plan were not delineated and shown on the Land Court Plan No. 20774G. Although the actual boundaries of the Conservation Restriction are not set forth or shown on Land Court Plan No. 20774G, the actual conservation boundaries are set forth and drawn by metes and bounds on the Conservation Restriction filed as Registration Land Document No. 3177, which restriction with attached plan is recorded in Book 94, Page 328. However, the boundaries of the two separate easements remain only as drawn as sketches, and not delineated by metes and bounds on Land Court Plan No. 20774G. This also compounded and made more problematic the relationship among the parties to these various actions.
The Conservation Restriction delineates by metes and bounds the areas designated as Easement Zone “A,” and the building zones, but neither the driveway easement nor the walkway easement. There was an amendment to the Conservation Restriction which was later signed and filed but for all practical purposes is of no consequence in regard to the facts of this case.
Second: The second document of significance is the deed from Goethals to Tavares. On October 29, 1992, Goethals conveyed Lot. No. 17 to Mary Tavares Trustee ofRFS Trust u/d/t dated April 13, 1992, by Quitclaim Deed recorded in Land Court Document No. 31782. This conveyance occurred after the recording of the Conservation Restriction. The consideration on the deed was $396,000. The Tavares deed was subject to two specific easements referred to in the deed: a driveway easement and a nonexclusive trail easement.
In regard to both easements referred to in the deed they refer to those easements shown on Land Court Plan No. 20774G. The deed from Goethals to Tavares recited that Lot No. 17 is burdened for the benefit of Lot No. 18 with a perpetual driveway easement twenty feet wide depicted on Land Court Plan No. 20774G and a perpetual trail easement for the benefit of Lot No. 18 within the area shown on Land Court Plan No. 20774G as “Walkway Easement fifteen (15’) Wide.”
In regard to the separate driveway easement, the deed from Goethals to Tavares provides in pertinent part as follows:
Subject to . . .
. . . (for the benefit of Lot 18 [Goethals /Streckers’ lot] on the Plan) and with the benefit of a perpetual, nonexclusive easement within the area shown on the Plan as “Driveway Easement 20’ Wide” (the “easement area”) for the purpose of travel and the installation and use of underground electricity, telephone and cable television lines. Except as otherwise provided in this paragraph, Grantee [Tavares] [and any successor owner of Lot 17] . . .) will bear the cost of installation, repair, maintenance and replacement of such lines within the easement area, such lines to be installed and maintained to have sufficient capacity for one house and one guest house on each of Lot 17 [Tavares’ lot] and Lot 18 [Goethals/Streckers’ lot] on the Plan. Grantor [Goethals] (and any successor owner of Lot 18 on the Plan) shall have the right to connect to such utility lines at the end of the easement area on the common boundary of Lot 17 [Tavares’ lot] and Lot 18 [Goethals/Streckers’ lot] on the Plan. Following such connection, Grantor [Goethals] (and any successor owner of Lot 18 [Streckers’ lot] on the Plan) shall share equally with Grantee [Tavares] (and any successor owner of Lot 17 [Tavares lot] on the Plan) the cost of repair, maintenance and replacement of such lines within the easement area.
(Emphasis added.)
In regard to the separate trail easement the Tavares’ deed provides in pertinent part as follows:
... [A] perpetual, non-exclusive trail easement, for the benefit of Lot 18 [Goethals/Streckers’ lot] on the Plan, within the area shown on the Plan as “Walkway Basement (15’ Wide)” for the purpose of pedestrian travel only from Lot 18 [Goethals/Streckers’ lot] to and from the beach area owned by the Town of West Tisbwry . . . Both Grantee [Tavares] (or any successor owner of Lot 17 [Tavares lot] . . . ) and any successor owner [successor to Goethals] of Lot 18 [Streckers lot] on the Plan... shall share equally in (i) the cost of installation of such trail and the construction of any improvements thereto, which improvements may include a boardwalk and small footbridge across wetland areas; and (ii) the cost of obtaining all permits necessary to install said trail and construct such improvements. Grantee [Tavares] (or any successor owner of Lot 17 [Tavares lot] . . .) and any successor owner to grantor [Goethals] shall mutually agree on the design and location of the trail and improvements. If Grantee [Tavares] (or any successor owner of Lot 17 ... ) wishes to install said trail and construct such improvements prior to the time that the Grantor [Goethals] has conveyed Lot 18 [Streckers lot] on the Plan to a Successor Owner after obtaining Grantor’s [Goethals’] approval of the design and location of the trail and improvements, Grantee [Tavares] (or any successor owner of Lot 17 on the plan) shall have the right to install such trail construct such improvements and maintain, repair and replace the same at Grantee’s [Tavares’] (or such Successor Owner’s,) sole cost and expense. Thereafter, in such event, before a Successor Owner can use said trail and improvements and as an express condition of said use, said Successor Owner shall pay to Grantee [Tavares] (or any successor owner of Lot 17 on the Plan) one-half of the cost of such installation and construction and of the cost of obtaining such permits. In any event, after a Successor Owner commences use of said trail and improvements, Grantee [Tavares] (or any Successor Owner of Lot 17 [Tavares *694 lot] on the plan) and the Successor Owner [Streckers] shall share equally in all subsequent and future costs of maintenance and replacement of said trail and improvements, all of which shall be mutually agreed to by Grantee [Tavares] (or any successor owner of Lot 17 on the plan) and the Successor Owner [Streckers[. Any approval required in connection with the foregoing trail easement shall not be unreasonably withheld or delayed.
(Emphasis added.)
A copy of Land Court Plan No. 20774Gwas attached to the deed to Tavares.
It is important to point out that the deed from Goethals to Tavares in 1992 recited substantial encumbrances on Tavares’ land, but these encumbrances preceded by three years the Common Driveway Agreement entered into between Goethals and Tavares in October of 1995 which also substantially affected the driveway easement and will be referred to hereinafter.
Third: The third document of significance is the easement from Tavares to Commonwealth Electric Company. On March 31, 1993, Mary Tavares as Trustee of RFS Trust granted to Commonwealth Electric Company an easement to locate electrical services. The pertinent provision of the easement grant is the following: “Said easement to be located on the southerly side of the ‘driveway easement’ on Lot 17 near the property line of Lot 18 on abovementioned plan [Land Court Plan No. 20774G].” This easement to the Electric Company was recorded on December 29, 1994.
Fourth: The fourth document is the Common Driveway Agreement executed between Goethals as owner of Lot 18 and Tavares (then record title holder) as owner of Lot 17, setting forth the rights and obligations of both parties in the common driveway easement as it related to both Lot Nos. 17 and 18. Although the Common Driveway Agreement between Goethals and Tavares is separate and distinct from the driveway easement referred to in the deed from Goethals to Tavares, it must be read in conjunction with and blended with the driveway easement referred to in the deed because both are executed by the same parties. Furthermore, it was entered into between the parties to “clarify’’ the rights and obligations of the owners of LotNos. 17 and 18. Itis apparent from the documents that this was the parties’ intent.
The Common Driveway Agreement is dated as signed by Goethals on October 2, 1995 and signed by Tavares on October 19, 1995. It was recorded simultaneously with the deed from Goethals to Strecker on October 25, 1995. The Common Driveway Agreement between Goethals and Tavares, hereinafter referred to, refers to a “Driveway Easement 20’ Wide area as shown on the Plan.” The Common Driveway Agreement provides in pertinent part as follows:
2. The owners of Lot 17 [Tavares] and 18 [Streckers] shall bear the equal responsibility of simple maintenance of the driveway located within the Easement Area as shown on the Plan [Land Court Plan No. 20774G]. Simple maintenance as utilized herein shall only include such costs associated with keeping the driveway in a passable condition and shall not include snow plowing or any extraordinary maintenance costs if the driveway is safe and in passable condition. Thesejoint obligations shall not include any improvements or reconstruction of the driveway . . . Neither party shall cause the common portion of the driveway to be widened beyond its present width. [Ten feet as a result of the prior Order of the conditions of WTCC limiting the actual driveway as constructed to 10’ to the culvert on behalf of Goethals;[27] and the subsequent Order of conditions issued to Streckers by WTCC.[28]]
3. The owners of Lot 17 [Tavares] and 18 [Goethals/Streckers] as shown on the Plan shall each be solely responsible for the prompt repair of any damage or reconstruction to the common driveway if solely responsible for its damage together with all costs associated therewith, if any, which it specifically causes to the common portion of the driveway located within the easement area.
4. Consent to utilize, maintain, repair or reconstruct the common portion of the driveway located within the Easement Area shall not be required for either the Lot 17 [Tavares] Owner or the Lot 18 [Goethals / Streckers] Owner, but the owner who elects to improve, reconstruct, repair or maintain the existing driveway above and beyond simple maintenance as defined in paragraph 2 herein, shall do so at his/her sole expense unless the other owner agrees in advance in writing to a sharing of the cost of the same. If either Owner elects to improve the driveway, that Owner shall give written notice to the other Owner, which notice shall include a detailed description of the proposed work and improvements at least fourteen (14,) days in advance of the start of any such work or improvements.
5. . . . Any Owner who shall file suit to enforce this covenant shall be entitled to reasonable attorneys fees incurred in enforcement, if said Owner is successful in such enforcement
6. The owners of Lots 17 and 18 shall not impede their use of the common driveway by parking upon it.
(Emphasis added.)
Fifth: The fifth document of significance relating to the two parcels is the Certificate of Acknowledgment of Payment. On October 19, 1995, Mary Tavares as Trustee executed a Certificate of Acknowledgment of Payment of the sum of $6,303 as payment in full for the costs incurred for obtaining permits, installation of a trail, and construction of improvements from Lot 18 (Goethals’ lot) to and from the beach area over Lot *695 No. 17 (Tavares’ lot) pursuant to the provisions of the Conservation Restriction. The Certificate of Acknowledgment of Payment was recorded on October 25, 1995. Its purpose was to give acknowledgment of compliance of the condition in Tavares’ deed from Goethals which provided that: “(B)efore a Successor Owner [successor to Goethals] can use said trail and improvements and as an express condition of said use, such Successor Owner [successor to Goethals] shall pay to Grantee [Tavares] . . . one-half the cost of such installation and construction and of the cost of obtaining such permits.”
At the time that Tavares acquired title to Lot No. 17 Goethals still owned Lot No. 18. Tavares/Sutula paid the cost of installation of the walkway to the beach in the amount of $12,605.93. One-half of that, or $6,303, was paid to Tavares on behalf of Goethals, albeit out of the real estate broker’s fees on the transfer to Streckers. This Court therefore infers that Goethals approved the location and the installation of the walkway as built by Tavares/Sutula including the boardwalk. As a result, all successor owners of Lot No. 18 are bound by that decision. Tavares, the grantee, approved the walkway designed by her husband Sutula. Tavares/Sutula erroneously believed that the walkway easement as actually constructed on the ground was located within the deeded walkway easement as shown on Land Court Plan No. 20774G, although in actuality it was not.
The Common Driveway Agreement between Goethals and Tavares dated October 2, 1995, and the Certificate of Acknowledgment of Payment between Tavares and Goethals dated October 19, 1995, were both recorded simultaneously on October 25, 1995 with the deed from Goethals to Streckers.
The actual payment to Tavares for one-half of the construction of the walkway was paid on behalf of Goethals to Tavares by the real estate brokers involved in the real estate transfer to Streckers. It was paid out of the Goethals’ fee on the transfer as an accommodation to Goethals to assure the transfer between Goethals and Streckers was concluded.
Sixth: The sixth document of significance as it relates to the two lots is the deed from Goethals to Streckers. On October 25, 1995, Goethals conveyed Lot No. 18 to William D. Strecker and Nancy W. Strecker “[s]ubject to and with the benefit of easements, restrictions and agreements of record, and as set forth in the deed registered as Document No. 31782 with said Land Court Division,” the latter reference being the deed from Goethals to Tavares. The consideration of the deed to Streckers was $500,000.

The Saga Between Tavares, Tavares/Sutula and Streckers

Francis Sutula is a physician specializing in reconstructive eye surgery. Mary Tavares, Sutula’s wife, holds a Doctorate in Public Health and is an academic in the health field. They have three children. Prior to their acquisition of Lot No. 18, Tavares/Sutula had owned vacation properly on Martha’s Vineyard since 1985. That properly was located on Stone Ridge Road, West Tisbury, Massachusetts. Tavares/Sutula were friendly with Harold Chapdelaine (Chapdelaine) who had been a builder on Martha’s Vineyard since 1979. Over the years Chapdelaine did work for Tavares/Sutula on their former Martha’s Vineyard home on Stone Ridge Road, West Tisbuiy.
William D. Strecker obtained a Ph.D. in engineering after which he worked for RCA. He then rose through the ranks through the years at Digital, eventually becoming the Senior Vice President and ultimately retired. He subsequently worked for a Texas corporation. At present he is a partner in Flagship Venture, a venture capital firm in Boston, Massachusetts. He is married to Nancy W. Strecker. They were married in 1989. They have four children and five grandchildren all of whom regularly visit them at their Martha’s Vineyard home located now on Lot No. 18.
Prior to their purchase of Lot No. 18, the Streckers had a summer home in Edgartown, Massachusetts. They had been looking for another property on Martha’s Vineyard for five years in order to build a permanent home.
In 1995, the Streckers had an apartment at the Ritz Carlton in Boston where they lived. They still maintain that apartment. It was and is used by either or both of them when there is a need for either or both of them to be in Boston for any length of time on business.

The Easements in Dispute Between the Parties to These Actions

Attached are two exhibits marked Exhibit No. 1 and Exhibit No. 2. They depict the two easements, the driveway easements (Exhibit No. 1) and the walkway easements (Exhibit No. 2). They are attached to assist the understanding of the facts of this case, and to illustrate how the facts developed over time.
For ease of understanding the plans, six colors are used blue, pink, orange, green, black and white.
The blue represents the driveway easement depicted on Exhibit No. 1 and labeled as “B,” as it was actually drawn on Goethals’ Land Court Plan No. 20774G. The same color blue also represents the walkway easement, depicted on Exhibit No. 2 and labeled as “E,” as it was actually drawn onto Goethals’ Land Court Plan No. 20774G.
The pink represents the driveway easement depicted on Exhibit No. 1 and labeled as “A,” as it was originally laid out and constructed by Tavares/Sutula (referred to as the “pre-2003 driveway”). The same color pink also represents the walkway easement, depicted on Exhibit No. 2 and labeled as “C” as it was laid out and actually constructed by Tavares/Sutula.
The orange represents the access pathway, depicted on Exhibit No. 2 and labeled as “D,” as it was *696 constructed by the Streckers after the issuance of a preliminary injunction by Garsh, J. on August 6, 2002.
The green represents the pathway over the dunes, depicted on Exhibit No. 2 and labeled as “F,” from a so called “locker box,” and established on the ground by Sutula.
The black dots represent the “Sutula Fence,” depicted on Exhibit No. 2, on the boundaxy line of Lot Nos. 17 and 18.
The white represents the pathway, depicted on Exhibit No. 2 and labeled as “G” as it was utilized by the Streckers to cross over the dunes and in order to reach the public beach area.
It is the differences among the various colored paths or paths’ locations which form the foundation for these various lawsuits. In these findings, references will be made repeatedly to these respective Exhibits.
Brad Austin (Austin) was a real estate broker on Martha’s Vineyard and had been since 1989. He became the real estate broker for Goethals’ land. He had walked Goethals’ property at least a dozen times before any portion of the property was sold. He observed that in 1990 the driveway extended in from Lamberts Cove Road to a point as far as the culvert, a distance of approximately three hundred feet: Austin observed only one beach path which started at the lot line of Lot Nos. 17 and 18 and was the same path cleared by Eldridge, Goethals’ architect. It had only one entry point. The precise location of this entry point that Austin had seen is not clear from the evidence.
In early 1991, Sutula visited the property in question, and was interested in purchasing it. The land, which at that time had yet to be subdivided, was for sale for $1,000,000, an amount which Sutula considered too much, and Sutula therefore did not pursue the purchase of the properly.
Later, in August of 1991, Sutula learned that the land was being subdivided and was being offered for sale as two lots. At that time the Conservation Restriction which was eventually developed had not been approved nor placed on the land. Sutula became interested in purchasing the property and became actively involved in working with Goethals and the WTCC in developing the Conservation Restriction. The suggestions of Sutula were partially incorporated into the Conservation Restriction that Goethals developed and presented to the WTCC. The Conservation Restriction was ultimately approved, and recorded or registered with the Land Court.

The Driveway Easement

Chapdelaine was hired by Tavares/Sutula as the developer and builder of the Tavares/Sutula home on Lot No. 17 in 1992. When first on the properly, Chap-delaine observed a path (the “deer path”) at the end of Frog Pond. He acknowledged that Lot No. 17, the Tavares lot, was eventually developed in phases between 1992 and 1995. At the end of 1992, Chapdelaine first brought the driveway from the culvert area to the area cleared for the construction of the Tavares/Sutula home.
Chapdelaine followed the directions of Sutula who had Hoehn stake the driveway at Sutula’s direction and • told Chapdelaine where to clear the driveway easement area. Chapdelaine objected to the easement area being cleared as laid out by Sutula because it would pass through an area which consisted of high blueberries which Chapdelaine opined should be preserved. Sutula, however, wanted to preserve a large oak tree which coincidentally was located within the deeded easement area as shown on Land Court Plan No. 20774G. Sutula also wanted to keep the driveway as far from the house to be built on the Tavares’ lot so as to preserve or increase the value of the Tavares/Sutula future home. Chapdelaine followed the instructions of Sutula and cleared the driveway easement area in the location of the “pre 2003 driveway.”
Hoehn, Goethals’ surveyor, then staked the driveway at the direction of Sutula. The partial driveway, previously cut by Goethals, already existed from Lambert’s Cove Road to the culvert, a distance of approximately 300 feet. Hoehn staked the driveway to the boundary of Lot No. 18, an additional distance of approximately 165 feet[29] as Sutula directed.
Sutula instructed Chapdelaine to clear the common driveway easement area to the southwest of the area shown on Land Court Plan No. 20774G and to extend it to the property line of Lot 18. Sutula expressed to Chapdelaine that Sutula would let the owner of Lot No. 18 worry about the consequences because it would be that owner’s problem and not Tavares/Sutulas.’ The staked out area was clearly outside of the location of the driveway easement area as shown on Land Court Plan No. 20774G.
Sutula, had he taken the time to retain an engineer, would have known or should have known that the driveway easement area as he staked it out for Chap-delaine and instructed it to be constructed, was being built outside of the driveway easement area as shown on Land Court Plan No. 20774G.
Jeff Serrisson (Serrisson) drilled a water well into the bush area of Lot No. 17 in order to get potable water for the Tavares/Sutula property. Serrisson mislocated the site and drilled the well in the wrong location. In fact it was drilled within the boundaries of the driveway easement as shown on Land Court Plan No. 20774G and is at present located in what is now the “post 2003 driveway,” although it was installed outside of what was the “pre 2003 driveway.”
Subsequent to the installation of the driveway, and at a point during the clearing of Sutula’s lot site and beach walkway, Richard Johnson (Johnson), Executive Director of SMF, visited the property and in *697 structed Sutula not to cut down trees, but to properly maintain the tree canopy. Johnson did allow trimming of the lower branches but insisted on the preservation of the upper canopy. The driveway as originally constructed on Lot No. 17 at the direction of Sutula remained in existence until 2003.
On March 31, 1993, Tavares, as Trustee of RFS Trust, granted to Commonwealth Electric Company an easement to locate electricity on the southerly side of the “driveway easement” on Lot 17 as shown on what was presumably Plan No. 20774G. Under the Tavares Deed as well as the Conservation Restriction, utilities to service both lots were to be installed within the deeded driveway easement area shown on Plan No. 20774G. With the exception of a short portion of the utilities leading from Lambert’s Cove Road and a short portion from the driveway at the junction of Lot Nos. 17 and 18 from the deeded driveway easement to the transformer, substantially all of the utilities were actually installed in the driveway which was initially built by Tavares/Sutula, Le.: within the boundaries of the “pre 2003, driveway” and not within the boundaries of the driveway as shown on Land Court Plan No. 20774G or what is referred to as the “post 2003 driveway.” Tavares/Sutula had actually installed a substantial portion of the driveway outside of the driveway easement area as shown on Land Court Plan No. 20774G thus making much of the utilities located outside of the driveway easement as shown on Land Court Plan No. 20774G. With the exceptions as noted at either end of the driveway on Lot No. 17, when Streckers relocated and reconstituted the driveway, the utilities were also then substantially outside of their proper location in the deeded driveway easement of Land Court Plan No. 20774G because the utilities were not moved and much remains within the “pre 2003 driveway.”
In 1995, Tavares/Sutula commenced the construction of their home. It was a modular construction. During construction, problems developed with the modular construction and Sutula and Chapdelaine had a falling out. Chapdelaine left the construction site, and Tavares/Sutula hired another contractor to complete the construction of their home.

Re Walkway Easement

The walkway easement is depicted on Land Court Plan No. 20774G as being fifteen feet wide.
In September of 1991, after learning that Goethals’ land was to be sold as two lots, Sutula became interested in purchasing one of the lots. Before Tavares, his wife, purchased Lot No. 17, Hurricane Bob made landfall on Martha’s Vineyard in September 1991. It substantially changed Goethals’ property near the beach area. Much of the dune area was significantly altered. Much of the tree growth and flora in the pond area was either wiped out, moved or substantially altered. Notably, this was after Tavares/Sutula had initially seen the property, but before Tavares purchased Lot No. 17, and years before the Streckers had seen Lot No. 18.
After Hurricane Bob, between the late fall of 1991 and the spring of 1992, Hoehn staked out the proposed location of the walkway easement on the ground of Lot No. 17. On April 10, 1992, Hoehn met with Sutula, Attorney James Reynolds (Reynolds),[30] Chap-delaine, Johnson and Sutula suggested to them how he preferred the proposed walkway be laid out. All gave verbal approval of Sutula’s plan. Sutula assumed that the walkway, as it was proposed and pointed out to and by him and as eventually installed on the ground, was entirely within the walkway easement as shown on Land Court Plan No. 20774G.
In fact, some of the walkway as it was laid out was located in the walkway easement, but as established on the ground most of it was not located within the actual walkway easement as shown on the Land Court Plan No. 20774G. As will be seen approximately eighiy percent of the walkway as installed was substantially without the walkway easement area as depicted on Land Court Plan No. 20774G, and approximately twenty percent was within the walkway easement as shown on Land Court Plan No. 20774G. However, that portion which was without the boundaries of the easement as shown on Land Court Plan No. 20774G substantially followed or paralleled the general course of what was depicted on Land Court Plan No. 20774G.
On February 3, 1992, prior to the conveyance from Goethals to Tavares/Sutula wrote to the WTCC indicating that his permits to complete the proposed walkway and boardwalk had expired. Sutula, even though not yet the owner of Lot No. 17, requested an extension of time for the permits through October 1993 in order to complete the cutting of the beach pathway and the construction of the boardwalk within the beach pathway. In April of 1992, prior to the transfer to Tavares, Sutula was actively involved with Richard Johnson, his lawyer James Reynolds who represented him in the transfer of Lot No. 17, and Douglas, Hoehn in the planning of the house site on which he would ultimately build the home of Tavares/Sutula. The request for the extension was granted by the WTCC.
On September 17, 1992, Goethals signed the Conservation Restriction naming SMF as grantee. SMF signed the acceptance of the grant. It was approved by the Selectman ofWestTisbuiy on September 10,1992. It was ultimately approved by the Executive Office of Environmental Affairs under G.L.c. 184, §32, on October 23, 1992. The Land Court examined the Conservation Restriction as to description only and approved the Conservation Restriction on July 16, 1992. The Land Court examiner noted that the restricted area referred to in the Conservation Restriction “will not be shown on [the Land Court] approved plan,” which was Land Court Plan No. 20774G. The Conservation Restriction was ultimately registered with the Land Court *698 on December 2, 1992, along with the deed from Goethals to Tavares.
After Tavares purchased the properly in 1992 Tavares/Sutula did a number of things to Lot No. 17 between January of 1993 and the spring of 1996.
In 1993, after the conveyance to Tavares, Chapdela-ine and Johnson met on the property as the walkway laid out by Sutula was being installed and being constructed. The construction of the walkway required a boardwalk because it was necessary to cross a wetland area on Lot No. 17 near the dunes, and the appropriate documents provided for construction of a boardwalk if necessary. Goethals still owned Lot No. 18, and continued to own it for two more years until the conveyance to Streckers in October of 1995.
In the spring of 1993, Richard Johnson (Johnson), who was then the Executive Director of SMF, made several visits to the property with Sutula. They walked the property several times, including the walkway to the beach. Johnson, Sutula and those others with them all agreed upon the simplest path to the beach which would have the least ecological impact. Sutula, Johnson and Chapdelaine met on several occasions. They determined the location of the walkway and the boardwalk within the presumed walkway to the beach. Sutula determined, or believed, that the walkway and the boardwalk were totally within the fifteen-foot walkway easement as shown on Land Court Plan No. 20774G. Sutula did not intend to build outside of what he thought was the deeded walkway easement area referred to on Land Court Plan No. 20774G. Johnson, however, was of the opinion that the proposed plan filed with the Conservation Commission was not consistent with Land Court Plan No. 20774G, but his opinion was disregarded by Sutula.
Johnson, without informing Sutula, instructed Chapdelaine to rotate the location of the boardwalk to make it more conducive to the lay of the land on Lot No. 17. Unbeknownst to all, it was rotated partly out of the deeded easement walkway area as shown on the Land Court Plan No. 20774G. Chapdelaine then constructed the boardwalk according to the instructions of Johnson, disregarding the staked layout of Sutula and Hoehn. Consequently, approximately one-third of the boardwalk is within the walkway easement as shown on Land Court Plan No. 20774G, and the remainder is without the walkway. Had the boardwalk not been rotated, it would have been located entirely within the walkway easement as shown on Land Court Plan No. 20774G, but it would not have connected the pathway established by Sutula which he directed his workmen to establish on the ground. In other words, it was the layout by Sutula which necessitated the rotation of the boardwalk, thus connecting and making whole the beach walkway from the Tavares /Sutula house area to the beach area and the necessary connection through the wetland area. Rotating the boardwalk necessitated a longer boardwalk than planned, unbeknownst to Sutula.
After Tavares purchased Lot No. 17, she never consulted with nor retained an engineer to stake out the twenty-foot driveway easement area nor the fifteen-foot walkway easement area as shown on Land Court Plan 20774G. As will be seen, the failure of Goethals to have a plan prepared with metes and bounds for both the driveway easement and the walkway easement, coupled with the fact that Tavares refused, failed, or neglected to retain an engineer to stake out the easements as shown on Land Court Plan No. 20774G became very problematic in the relationship between the parties involved in these various actions.
In regard to the walkway, in 1993 Sutula marked the trees and the path to be cut. In 1993 when Sutula cut the walkway, he cut what is now the lower pathway at an entrance point fifty feet below the concrete bound and in close proximity to the so called ravine area. This is referred to as the “lower pathway entrance” depicted on Exhibit No. 2. This first cut was two years before the Streckers purchased their Lot No. 18. Seven years later, in 2001, Sutula recut the entranceway path. This latter cut was six years after the Streckers had purchased their Lot No. 18 in 1995. In 1993, Sutula instructed Chapdelaine where to establish the path and how wide to make it. Stumps which were remaining were ground down. The path came to a point of land which appeared to be the best to establish the boardwalk in the wetland areas. At that point of construction, Chapdelaine, Hoehn and Johnson were present. Chapdelaine never had an occasion to see the plans, but simply followed Sutula’s direction. After the beach walkway was cut in 1993, it was maintained from Tavares’ property to the beach, but not that portion from the beach pathway extension to the boundary of Lot No. 18, which overgrew and became dense by 1996.
Had Sutula retained the services of an engineer, he would have or should have known that as he laid out the path of the walkway on the ground to the beach, the walkway would be substantially outside of the deeded walkway easement area as shown on Land Court Plan No. 20774G. Chapdelaine then attended to clearing the pathway as directed by Sutula. He designed and built an elevated walkway across the wetland.

Tavares/Sutula Vis-a-Vis Streckers

In the spring of 1995, four years after the landfall of Hurricane Bob, Austin showed Streckers Lot No 18. By that time the Land Court Plan No. 20774G had been filed with the Land Court for three years and the Tavares deed had been recorded as had been the Conservation Restriction, and the easement to Commonwealth Electric Company.
Strecker walked Lot No. 17 and viewed it. He observed that the beach pathway over Lot No. 17 was *699 then in existence. He observed what he referred to herein as the “upper walkway entrance” shown on Exhibit No. 2. He walked it several times from Lot No. 18 and over Lot No. 17 to the beach area utilizing the “upper pathway entrance” and then pathway “C.” He observed that Lot No. 18 had a sunset view. Strecker inquired about the walkway and determined from what he was told that the walkway, as he saw it, was an easement to the beach and had been paid for. The Tavares/Sutula home had not yet been fully constructed, but was under construction.
Austin identified to Strecker the then existing walkway to the beach and the entranceway to it at the concrete bound. Austin and the Streckers walked the walkway to the beach area over Lot No. 17. The walkway appeared to Strecker to be worn by walking although at the time of the inspection of the property, neither Austin nor Strecker had a survey of the walkway. The Streckers made several visits to the property. They determined that they had a clear view of the sunset from the site and that the property had high value because, although it did not actually abut the ocean it abutted and had access to the town beach, which was the equivalent of oceanfront property.
In anticipation of purchasing Lot No. 18, the Streckers requested proof that the one-half payment for the construction of the walkway to the beach had been paid pursuant to the payment provisions of the Conservation Restriction.
Austin, on September 15, 1995, sent a summaiy of the expenses to construct the walkway put together by Sutula totaling $12,605.93 to Goethals who still owned Lot No. 18 at the time. Goethals approved the sum of $6,303 representing one-half of the amount of reimbursement required by the Conservation Restriction for the construction of the walkway, thus approving not only the cost, but also this Court concludes, the location of the walkway. Tavares ratified and confirmed the receipt of payment from Goethals by a Certificate of Acknowledgment of Payment dated October 1995. That was recorded the same date as a deed from Goethals to Strecker on October 25, 1995.
Goethals conveyed Lot No. 18 to William D. Strecker and Nancy W. Strecker, as husband and wife tenants by the entirety for consideration of $500,000 on October 2, 1995. The deed was registered in the Land Court as document 31782. The deed was conveyed subject to and with the benefit of easements, restrictions and agreements of record as set forth in the deed registered as Document No. 31782 with the Land Court Division.
The Common Driveway Agreement between Goethals and Tavares was also dated October 2, 1995, and was simultaneously recorded with the deed from Goethals to the Streckers.
The construction of the Tavares/Sutula home was completed by Labor Day 1996 when they took occupancy.
The Tavares/Sutula home was a vacation home to them as well as a rental home used to pay for the construction of the house. Tavares/Sutula typically used the home in August of each year as a vacation home with their visiting family members and guests, and then rented during their non-occupancy times.
During that same period, the spring of 1996, the Streckers commenced construction of their home. It was completed in the summer of the same year. The Streckers intended it to be their permanent home in which they would live year round. The unit they owned at the Ritz Carlton in Boston would be used solely as a satellite home whenever it was necessary for either or both of them to attend functions in Boston.
When the homes of both the Streckers and Tavares/Sutula had been completed in 1996, the Streckers began to use the walkway path to the beach that they saw extant in 1996, the walkway which entered at the concrete bound, the “upper pathway entrance," and depicted on Exhibit No. 2. It extended over the property of Tavares/Sutula on Lot No. 17 and connected to the beach walkway established by Tavares/Sutula, labeled “C” pathway on Exhibit No. 2. The Streckers used this walkway for access to the beach area in 1996, 1997, and in 1998 for both themselves, their family members, and their guests.
In 1996, Tavares/Sutula opined that the Streckers, by using the “upper pathway entrance,” were not using the correct entranceway to the walkway easement area. Tavares/Sutula opined that the “upper pathway entrance” was being used by Streckers only on a temporary basis as the Streckers had just completed and moved into their new home. Sutula opined that eventually the Streckers would move the entranceway to what Sutula opined was the actual entrance, which was fifty feet below the concrete bound, and that the Streckers would use the pathway cut by Sutula in 1993, three years earlier. This latter area is shown as the “lower pathway entrance” on Exhibit No. 2.
In August of 1997, the Streckers were still using the entrance to the walkway which was at the concrete bound, the “upper pathway entrance,” thus taking them across the lower front lawn portion of the Tavares/Sutula property. In the latter part of 1997 Tavares/Sutula questioned Strecker as to whether he was using the correct entrance path for the pathway. Sutula opined and suggested that the proper en-tranceway was fifty feet closer toward the ocean than the one which the Streckers were actually using. Sutula suggested that as Tavares/Sutula sat in their home overlooking the Vineyard Sound they saw the heads of people from the Streckers’ property as they crossed on the front lawn area of the Tavares/Sutula property. Tavares/Sutula opined that the Streckers were on the wrong path and should have been further down the slope from whence they crossed, namely at the area of the ravine, which was approximately fifty *700 feet below the concrete bound, the “lower pathway entrance.”
Streckers opined to Tavares/Sutula that there was no pathway entrance fifty feet below the concrete bound. Strecker opined that the area suggested by Tavares/Sutula was rugged terrain with a small gulch or ravine and that in order to use that area, the Streckers would have to put in a path, as well as a boardwalk or bridge. Strecker further opined that in order to do that he would have to go before the Conservation Commission.
Sutula suggested to Strecker that Strecker ignore the Conservation Commission. Strecker opined that was not acceptable and that both he and Tavares/Sutula would have to approach the Conservation Commission in order to establish the walkway that Sutula had suggested. Sutula then suggested to Strecker that the walkway entrance was the Streckers’ problem, and not Tavares/Sutula. Tavares/Sutula assumed Streckers would move the entranceway to the walkway to fifty feet below the concrete bound. Streckers did not do so, but continued to use the “upper pathway entrance” to gain access to the beach walkway.
The relationship between the neighbors then began to deteriorate rapidly and badly. During the period of time from 1996 through 1999, Sutula periodically sent Strecker a summary of the costs to maintain the existing beach walkway so as to be reimbursed for one-half of the costs under the terms of the Conservation Restriction. At all times, Sutula thought and believed that the walkway, except for the “upper pathway entrance,” was built within the walkway easement as shown on Land Court Plan No. 20774G.
Throughout 1998 Streckers and their family and guests continued to use the “upper pathway entrance” and to cross the corner of the lawn area of the Tavares/Sutula home and Tavares/Sutula did not prohibit the Streckers from using that walkway through 1998.
In October of 1998, Tavares/Sutula sent a letter to the Streckers requesting reimbursement of $420.00, which represented one-half of the $840.00 paid by Tavares/Sutula to maintain the beach walkway. In the same letter Tavares/Sutula also notified Streckers that they had erected a gate at the entrance to the driveway at Lambert’s Cove Road the previous autumn without consulting with the Streckers and used the gate structure to mount an identification sign for both Tavares/Sutula and the Streckers. The letter suggested that words were exchanged between one of Tavares/Sutula’s friends and Strecker. Tavares/Sutula suggested they discuss the matter. The Streckers never responded to Tavares/Sutula’s letter, and never paid for one-half of the expenses for the work to maintain the walkway. The relationship between the neighbors continued to deteriorate.
In August of 1999, Tavares/Sutula wrote to the Streckers. Tavares/Sutula expressed their disappointment in not receiving a reply to their letter of 1998 and expressed their view that the expenses to maintain the walkway were to be shared. Tavares/Sutula also reminded the Streckers that two years earlier, Tavares/Sutula had pointed out that the correct entrance to the walkway easement was fifty feet further down toward the beach area, the “lower pathway entrance.”
Tavares/Sutula in that same letter gave notice that although they had allowed the Streckers to use the walkway fifty feet closer to the Tavares/Sutula house than the Streckers’ deed allowed, that is the “upper pathway entrance,” that Tavares/Sutula were now rescinding the license to use the “upper pathway entrance” because of the lack of privacy and the intrusion upon their property. Tavares/Sutula requested the Streckers relocate the entranceway to the beach walkway to the “lower pathway entrance.” Tavares/Sutula in that same letter notified the Streckers that their use of the driveway was for easement purposes only and they could not do work on it without the consent of Tavares/Sutula.
Streckers opined that the entrance to the walkway was at the concrete bound, the “upper pathway entrance,” including the beach walkway all the way to the beach that was shown to them by Austin and was acknowledged on the Certificate of Acknowledgment by Tavares.
During this same period of time a dispute surfaced between Tavares/Sutula and the Streckers in regard to the pathway over the dunes which accessed the beach area. Tavares/Sutula installed a “locker box,” depicted on Exhibit No. 2, at the intersection of “F” pathway (depicted in green) and “G” pathway (depicted in white). Tavares/Sutula established and used the “F” pathway, the path to the right of the “locker box,” which they believed to be within the deeded walkway easement. It was a pathway which traversed up and over the dunes to the beach. The Streckers used the “G” pathway, which cut down the side embankment of the dunes to the base, through which flowed Coca-Cola Brook.
This latter pathway used by the Streckers was actually within the fifteen-foot deeded walkway easement area as shown on Land Court Plan No. 20774G. This Court concludes, however, that fact was not known by the Streckers at the time because neither they nor Tavares/Sutula had obtained the assistance of any surveyors to establish the exact location of the proposed walkway. Tavares/Sutula believed the walkway they had established was in fact within the boundaries of Land Court Plan No. 20774G. This Court further concludes that the area of Coca-Cola Brook is fragile, as opposed to the area of the dune crossing, which is much less fragile. Land Court Plan No. 20774G was developed and drawn in June of 1991 *701 prior to Hurricane Bob which made a landfall on Martha’s Vineyard in September of 1991 and substantially altered the whole water view area of Goethals’ property as previously noted. The Court is also mindful that the pathway to the beach was referred to in the recorded instrument as “approximately located,” as opposed to the driveway easement which had no such liberties, but was firm in its description.
The issue as to the point of entiy to the beach became another matter of contention between the parties causing their relationship to further deteriorate.
On September 16, 1999, Tavares/Sutula again wrote to the Streckers and expressed their concern about the intrusion on their privacy caused by the Streckers passing through the Tavares/Sutula front yard. Their letter reminded the Streckers that in August of 1997 they had met and informed the Streckers that they were using an entiyway fifty feet closer to the Tavares/Sutula home than allowed by the Strecker deed; further indicated that they rescinded their permission for the Streckers to use the “upper pathway' entrance”; and that Streckers should relocate their entry point to the walkway. Tavares/Sutula also gave notice that by the fall of 1999 they would erect a fence along the property line between the Streckers and Tavares/Sutula, effectively blocking off the “upper pathway entrance.” There were verbal discussions between the parties about the different entrance ways to the beach at the “locker box” location, but to no avail.
In the latter part of September 1999, the Streckers notified WTCC of Tavares/Sutula’s intent to have the Streckers relocate the access path on the properly line of the Streckers from the “upper pathway entrance” to the “lower pathway entrance.” WTCC responded to the Streckers that it hoped that the parties would mutually agree upon an access point, and reminded the Streckers of the need to protect the wetland area.
On October 7, 1999, the Streckers, though their then lawyer, Edmond G. Coogan, Esq., replied to the prior correspondences of Tavares/Sutula and, in substance, indicated the Streckers had the right to use the “upper walkway entrance” to the beach walkway as it then existed. Coogan’s letter suggested to Tavares/Sutula that there would be “most serious legal consequences” if the Streckers were prevented from using the “upper pathway entrance.” The relationship between the neighbors continued to deteriorate.
Tavares/Sutula did not receive the letter of Attorney Coogan dated October 7, 1999. Consequently, Coogan wrote further correspondence to Tavares/Sutula and reiterated the stance set forth in Coogan’s letter of October 7,1999 and threatened legal action.
On April 24, 2000 Tavares/Sutula again wrote to the Streckers and indicated that Tavares/Sutula that they had received no response to their prior correspondence; and reiterated that Streckers were not to use the “upper pathway entrance,” to the walkway, and that they were to use the driveway for access only and not do any further work on the driveway.
On June 16, 2000, Tavares/Sutula corresponded with Hoehn to comment on the proposed plans of a free standing guesthouse they would build on their Lot No. 17, but more importantly to comment on the location of the walkway. Sutula reminded Hoehn that he, Sutula, had previously walked the walkway with Hoehn, Chapdelaine and Reynolds, and had established the walkway as close to the pond on the lowest elevation so as not to intrude on Tavares/Sutula’s home. Tavares/Sutula inquired of Hoehn whether he recalled the conversation about the concrete bound that was placed in error in its present location and that the actual location should have been fifty feet closer to the water. There is no evidence of any reply by Hoehn.
In 2000, Strecker met with Hoehn, Reynolds and Coogan at the property to view the “upper pathway entrance” and Hoehn and Reynolds suggested the use of the “lower pathway entrance.” Tavares/Sutula were not present and chose not to be present. Those present stood at the top of the bank and looked at the suggested “lower pathway entrance.” Hoehn pointed out the location of the deeded walkway easement, as well as the walkway cut below the ravine. It was the same walkway originally cut by Sutula in 1993 but then left unattended. It was overgrown and it appeared that it had not been cut or maintained for several years. Strecker made no comment.
In August of 2001, Sutula recut the lower path extension to the property line of Strecker so as to connect “lower pathway entrance” with the beach pathway. Strecker, when he observed it, saw the path but opined that it had not been there before. He did not use it because he did not have access to it because of a small ravine on his own property precluding access. A sketch of Streckers’ actual and revised path showing the “upper pathway entrance” and the “lower pathway entrance” was sent to the WTCC by Sutula.
On August 21, 2001, the WTCC wrote to Streckers and to Tavares/Sutula to invite all to a meeting on August 28, 2001 with Johnson of the SMF to discuss the access path to Lambert’s Cove Beach from Lot No. 18. The WTCC letter further suggested that work done in the area not impact the wetland resource area and that any work be done with a proper permit. The Streckers attended the meeting. Tavares/Sutula chose not to attend.
On March 29, 2002, the Streckers, through their then lawyer Robert McCaron, wrote to Tavares/Sutula suggesting the following resolution on behalf of the parties:
*702 (1) Mutually retain an engineer to properly locate the various paths and address necessary permitting questions;
(2) Apply for necessary permits to the WTCC to allow relocation of the path, and if the permits were denied then the path as originally constructed and historically used would remain;
(3) If WTCC approved the relocation, relocate the walkway easement, costs to be borne by Tavares / Sutula;
(4) Execute and record appropriate easements; and
(5) Execute an agreement evidencing the above.
The proposed resolution was to no avail. Tavares/Sutula returned to Lot No. 17 for vacation in August 2002. Sutula installed a three-foot high split-rail fence on the boundary line of Lot Nos. 17 and 18 in the area of the concrete bound to the area fifty feet below the concrete bound. It is depicted on Exhibit No. 2 as “Sutula fence.” The fence was minimally but partly constructed within the wetlands buffer zone and no application was made to the WTCC for authorization to construct the fence. The fence along the property line of Lot Nos. 17 and 18 effectively blocked the Streckers’ access to the “upper pathway entrance” by the area of the concrete bound and thus effectively blocked the Streckers from the use of the beach walkway. The fence stopped just before the ravine area, so as to allow the Streckers’ access through the path previously pointed out by Hoehn and referred to as the “lower pathway entrance.”
Tavares/Sutula installed sixteen fence posts, eleven of which were either on the common boundary line or just inside the property line of Tavares/Sutula. In regard to the remaining five posts, the Streckers had the posts surveyed and determined that two on one end of the fence line and three on the other end of the fence line were in fact located slightly onto the property of the Streckers.
On August 2, 2002, Streckers filed their complaint in Dukes County Superior Court Docket No. DUCV 2002-00044, the first of all of the various complaints involved in consideration of these cases. The Streckers’ complaint sought a Preliminary Injunction against Tavares/Sutula, seeking to enjoin Tavares/Sutula from preventing Streckers from accessing the entry point of the walkway at the concrete bound at the “upper pathway entrance.” The hearing on the Temporary Restraining Order was on August 6, 2002 before Garsh, J.
At the time of the hearing the Streckers had in their possession a so-called August 5, 2002 Provost Plan. The August 5, 2002 plan was not presented to the Court at the August 6, 2002 hearing before Garsh, J. It was also not shared by counsel for the Streckers with counsel for Tavares/Sutula, nor with counsel for S.M.F. It was secreted by the Streckers for reasons not developed by the evidence.
The August 5, 2002 plan which the Streckers received from Vineyard Land Surveying, Inc. (the so-called Provost Plan) was entitled “Plan of Land in West Tisbuiy, Mass. Prepared for William and Nancy Strec-ker dated August 5, 2002,” and depicted both Lots No. 17 and 18. The survey depicted the two easements as shown on Land Court Plan No. 20774G the twenty-foot driveway easement and the fifteen-foot walkway easement. The survey also depicted the actual location of the driveway as it existed on the ground, the “pre 2003 driveway,” and established by Sutula; and the actual location of the walkway, the beach walkway used by Tavares/Sutula and laid out by Sutula, and the en-tranceway, the “upper pathway entrance” used by the Streckers to attain access to the beach walkway.
It is clear and apparent from the plan that in regard to the driveway, the driveway which was installed was initially installed within the easement for approximately two-thirds of the way into Lot No. 17 from Lambert’s Cove Road to just past the culvert. The driveway, as shown on the Provost plan of August 5, 2002, then truncated southwesterly out of the easement area as shown on Land Court Plan No. 20774G and extended to the property line of Lot No. 18.
In regard to the beach walkway, as it exists on the ground, it is clear from the August 5, 2002 Vineyard Land Surveying Plan, the Provost plan, that the beach walkway, although it followed generally the course of the beach walkway easement depicted on Land Court Plan No. 20774G, it actually meandered in a serpentine manner in a general direction but outside of the walkway easement as shown on Land Court Plan No. 20774G, on occasion crossing over the walkway easement as depicted on Land Court Plan No. 20774G. The walkway as it existed on the ground was four feet wide.
The August 5, 2002 Vineyard Land Surveying Plan is essentially the same as shown on Exhibit Nos. 1 and 2 which are attached hereto and incorporated herein and are previously referred to. As stated earlier, those portions shown in blue are the easement areas as shown on the Land Court Plan No. 20774G; those areas shown in pink are the actual layout of both the driveway and the walkway easement as originally constructed by Sutula. Each are depicted on the Provost plan.
It is clear from the transcript of the hearing on the Preliminary Injunction in 2002 before Garsh, J., that the only issue before that Court was the entry point to the beach pathway from the Streckers’ land, and whether it was at the concrete bound, the “upper pathway entrance,” or fifty feet below the concrete bound, the “lower pathway entrance.”
Tavares/Sutula, both in their pleadings as well as their arguments through counsel, maintained that Tavares/Sutula believed the whole walkway area to the beach to be within the deeded walkway easement of Land Court Plan No. 20774G, except for the entryway used by the Streckers at the “upper pathway *703 entrance,” and the short upper pathway across the front of Tavares/Sutula property connecting to the walkway easement. Tavares/Sutula further represented to Garsh, J., that if the Streckers utilized the “lower pathway entrance” which Sutula cleared in 1993 and recut in 2001, that the Streckers would then be walking within the total deeded walkway easement area as shown on Land Court Plan No. 20774G.
After a hearing, Garsh, J., denied Streckers’ application for a Preliminary Injunction, but allowed a Preliminary Injunction to Tavares/Sutula on their counterclaim enjoining the Streckers from using the “upper walkway entrance” except as shown on Land Court Plan No. 20774G. In pertinent part the Preliminary Injunction provides as follows:
After hearing on the matter, the plaintiffs [Streckers] are enjoined and restrained from entering onto the defendants’ [Tavares] land, described as Lot 17 on Plan 20774G except within the boundaries of the walkway easement shown on said plan and use [sic] said easement only for the purposes of a walkway. The defendants [Tavares/Sutula] shall not interfere with the plaintiffs’ [Streckers] use of the deeded walkway easement as a walking path to the beach.
The order of Garsh, J., dealt only with the entrance to the walkway easement and the use of the walkway easement by the Streckers, and not at all with the driveway easement which was not then in litigation.
As a result of the issuance of the Preliminary Injunction, Streckers saw no apparent solution to obtain access to the beach area except to make an entryway to the walkway from their home at an area fifty feet closer toward the ocean, because Tavares/Sutula had effectively barricaded, by the “Sutula fence,” the pathway which the Streckers had used, and Tavares/Sutula had obtained the injunction from Garsh, J., in regard to the “upper pathway entrance.”
Consequently, and in order to comply with the order of Garsh, J., on August 13, 2002, the Streckers filed a request for determination of applicability with WTCC in order to construct the “lower pathway entrance” depicted on Exhibit No. 2. It was submitted by their engineer Glen Provost as their agent. The application sought to cut and maintain brush, to establish a walking path three feet wide on Streckers’ land along the existing fence installed by Tavares/Sutula, and to connect the path to the existing beach pathway on the lower end, the “lower pathway entrance,” depicted on Exhibit No. 2 over the property of Tavares. There was a ravine which had to be crossed on Streckers’ land and so the request for determination also sought to construct an elevated wood walkway supported by six four by four posts set into the ground. The walkway would be twenty feet long to traverse the ravine. The WTCC approved the application. There is no evidence before this Court that SMF was given prior written notice nor did SMF ever approve in writing the work to be performed on the “lower pathway entrance.”
In October of 2003, Sutula determined from another partial plan that had been drawn by Streckers’ engineer Provost that the Tavares/Sutula well had been incorrectly located in the driveway easement area shown on Land Court Plan No. 20774G and not drilled on the original proposed well site. This was shown on a partial plan of land for William and Mary Strecker revised August 19, 2003. The plan depicted only the driveway easement area. It did not depict the walkway easement even though the plan of Provost previously provided to the Streckers dated August 5, 2002, depicted both easement areas and the misplacement of the well.
On October 7, 2002 Tavares/Sutula faxed Hoehn four sketches of the driveway easement area. The first was a sketch drawn for the Streckers by Vineyard Land Surveying, Inc. The second sketch depicted the twenty-foot-wide driveway easement as shown on the Land Court Plan No. 20774G, as well as the existing eight-foot wide dirt driveway as constructed. The third sketch depicted the location of the Tavares/Sutula home; the proposed well site location to the right of the driveway easement as shown on the Land Court Plan No. 20774G, and the actual location where the well was drilled which is located within the driveway easement as shown on Land Court Plan No. 20774G; and the proposed driveway from the easement as shown on Land Court Plan No. 20774G to the Tavares/Sutula home. The fourth sketch depicted the actual driveway as it was constructed by Tavares/Sutula on Lot No. 17, outside of and to the left of the driveway easement as shown on Land Court Plan No. 20774G. It also depicted the proposed driveway to the Tavares/Sutula home, the actual well location, and the driveway with a cul-de-sac which was the driveway Sutula preferred. Sutula also sent a copy of these same plans to WTCC to determine whether the “preferred driveway” would be an issue with the WTCC because the “preferred driveway” shifted the driveway closer to, but still one hundred feet away from the wetland area.
The Streckers did not share the August 5, 2002 plan, which showed both the driveway easements and the walkway easements previously referred to, with Tavares/Sutula or their lawyer until the eve of trial before this Court on April 27, 2007, and only after a Court Order by this Court on Discovery to do so. The plan was, however, submitted to the WTCC when the Streckers applied to construct the bridgeway at the lower end of their property, which was also eight days after Judge Garsh issued her Preliminary Injunction in favor of Tavares/Sutula on their counterclaim. It was open to public inspection, including inspection by Tavares/Sutula who never took advantage to do so.
In 2002, in the counterclaim filed by Tavares/Sutula in Superior Court Action No *704 DUCV2002-00044, Tavares/Sutula sought relief so as to bar the Streckers from using any portion of the Tavares property which was outside of the easement or the deeded walkway easement in the form of a Declaratoiy Judgment and that the Streckers “. . . have no lawful right of access to Lot 17 other than those limited rights of access contained in the 1992 deed from Goethals to Tavares.”
In July of 2003, all parties became aware that the driveway which was actually built by Tavares/Sutula was not within the deeded easement area as set forth on Land Court Plan No. 20774G. In either September or October 2003, at the time Glen Provost was being deposed by counsel for Tavares/Sutula, counsel for Tavares/Sutula gave notice to the Streckers that the Streckers were driving to and from their property outside of the deeded driveway easement area as shown on Land Court Plan No. 20774G, were walking outside of the deeded walkway easement area to and from the beach as shown on Land Court Plan No. 20774G, and if they continued to do so it would constitute a trespass for which they would be prosecuted.
Streckers at this time were living permanently in their home on Lot No. 18 on Martha’s Vineyard. The Streckers opined that if they continued to use the misplaced driveway, the “pre 2003 driveway,” that they would not be passing within the deeded easement area according to Land Court Plan No. 20774G and therefore they could be prosecuted criminally. Furthermore, the Streckers opined that if they could not use that misplaced driveway that they would have no access to a home that was their permanent residence. They also opined that they would have no access to the beach area from their home as the walkway that was actually constructed was also outside of the deeded easement area shown on Land Court Plan No. 20774G. They opined they would therefore be landlocked out of their home, as well as landlocked from access to the beach.
Consequently, on July 25, 2003, the Streckers gave notice to Tavares/Sutula under Paragraph Four of the Common Driveway Agreement that the Streckers intended to reconstruct the common driveway within the “deeded driveway easement” as shown on Land Court Plan No. 20774G and that the work would begin on or after August 12, 2003. Although the Streckers did not provide a copy of the Provost plan dated August 5, 2002, that the Streckers had received from their engineer, the Streckers did mark out on the ground the proposed reconstructed driveway with orange flags, and indicated in their notice letter that would therefore bring the driveway entirely within the deeded easement area set forth in Land Court Plan No. 20774G. They also notified Tavares/Sutula that Tavares needed to remedy Tavares’ incorrectly located water well which had been placed within the deeded driveway easement as shown on Land Court Plan No. 20774G because the reconstructed driveway would pass over the well.
On August 15, 2003, Glen Provost, as agent for the Streckers, filed an N.O.I. with the WTCC giving notice of intent to excavate, construct and maintain a new dirt driveway with a minimum width of ten feet within the deeded easement as shown on Land Court Plan No. 20774G.
Statutory notice was given to the abutters on behalf of the Streckers by Glen Provost and included notice to Mary Tavares, Trustee of RFS Realty Trust the record owner of LotNo. 17. On August 18, 2003, notice of the N.O.I. was received by Mary Tavares who signed as Mary Sutula.
A public hearing was held on September 9, 2003. Tavares/Sutula voiced their objections to the driveway work on their land proposed by Streckers. Notwithstanding that objection, on September 24,2003 WTCC issued an Order of Conditions authorizing the Streckers to relocate and build a ten-foot-wide driveway, including a number of conditions — that the work conform to the plan of Vineyard Land Surveying, Inc. dated August 19, 2003; that the driveway be limited to a ten-foot width (within the twenty-foot-wide driveway easement); and steps be taken to preserve the water well located in the driveway. This second approval by the WTCC to reconstruct the driveway (Streckers’ application), but to limit it to ten feet, coupled with the first approval of the WTCC to construct the driveway from Lambert’s Cove Road to the culvert (Goethals’ application), effectively limited the actual width of the constructed driveway to ten feet wide from Lambert’s Cove Road to the boundary of Lot No. 18. However, the limitation on the width of the actual driveway to ten feet in no way affects the fact that the easement for the same distance is twenty feet. In other words, the Streckers have an easement 20 feet wide, within which they could build a ten-foot wide driveway, and the Streckers have use of the driveway and its shoulders (presumably 5 feet on each side of the actual driveway), all as a right of way easement.
On September 30, 2003, Tavares/Sutula gave notice to WTCC that they wished to appeal the decision of the WTCC.
On November 7, 2003 Tavares/Sutula notified the Department of Environmental Protection (DEP) of the Southeast Region and WTCC that it was their opinion that there was no need to relocate the driveway and that Tavares/Sutula were then happy to change the driveway easement for the Streckers to reflect the current driveway utilization, that is the “pre 2003 driveway,” or where the driveway was originally built by Sutula, albeit outside of the deeded driveway easement as shown on Land Court Plan No. 20774G.
On November 18, 2003, the DEP issued a super-ceding Order of Condition allowing the Streckers to go forward with the relocation of the driveway as proposed before the WTCC, that is the “post 2003 drive *705 way” location. There was no further appeal administratively or to the Court by Tavares and the Streckers then proceeded to reconstruct and relocate the driveway from the “pre 2003 driveway” location to the “post 2003 driveway” location on the Tavares’ Lot No. 17. In doing so Streckers took down the large oak tree which Tavares/Sutula wished to preserve and which was located within the deeded driveway easement as shown on Land Court Plan No. 20774G. The Streckers also brought the ten-foot wide driveway adj acent to the well area of Tavares/Sutula, of which were located within the deeded easement driveway area as shown on Land Court Plan No. 20774G. The Streckers reconstructed the driveway so as to not affect or impede the Tavares’ well, which had been mislocated by Tavares, and so as to conform to the Order of Conditions issued by the WTCC.
Work on the reconstituted driveway was completed by January 22, 2004, at which time WTCC issued a Certificate of Compliance for the Order of Conditions that had been issued in connection with the relocation of the driveway, thus approving the relocation of the driveway as built.
On July 13, 2004, Tavares/Sutula completed their free standing guest house. In the spring of 2004, the relationship between the neighbors continued to deteriorate to a very low level. Sutula commenced placing debris including a broken toilet, scaffolding, landscaping debris, lumber, and other miscellany, immediately adjacent to the “post-2003 driveway,” and next to the Streckers’ grandchildren’s swing set. Sutula allowed the debris to remain there for two years until the eve of the first trial hereinafter referred to, at which time it was removed by Sutula. The debris and the rocks were actually located on Tavares’ Lot No. 17, and not on Streckers’ Lot No. 18. After the relocation of the driveway by the Streckers from the “pre 2003 driveway” location to the “post 2003 driveway” location, Sutula placed large boulders at the entrance of the abandoned “pre 2003 driveway” preventing use of that former route by the Streckers.
Brian M. Hurley, Esq., Streckers’ lawyer at the time, sent written notice to Donald J. Kaiser, Esq., counsel for Tavares/Sutula to notify them that Tavares/Sutula had trespassed onto the Strecker property by installing the electrical junction box located on the Streckers’ property, but used for Tavares/Sutula’s guest home. He also requested that Tavares/Sutula remove the debris which Tavares/Sutula had deposited next to the Streckers’ property line. Sutula eventually removed the debris, but not until the eve of the original or first trial in this matter in April of 2006.[31]
On March 14, 2006 Glen Provost of Vineyard Land Surveying, Inc. produced an engineer’s plan for the Streckers. It is a plan of land entitled “Plan of Land in West Tisbuiy Mass. Surveyed for William & Nancy Strecker by Vineyard Land Surveying, Inc. dated March 14, 2006.” It depicts a number of things. On Lot No. 18, it depicts the location of the Strecker home. It also depicts the original walkway entrance used by the Streckers as it entered Lot No. 17 at the concrete bound, the “upper pathway entrance,” and the trail that the Streckers followed from that point over Lot No. 17 to the “upper pathway” or “C” pathway used by Tavares/Sutula. It further depicts the corrected walkway from the Strecker home fifty feet to the newly relocated entiyway, the “lower pathway entrance,” or “Streckers’ pathway,” used to obtain access to the walkway path over Lot No. 17. It further depicts the walkway area on Lot No. 17 which Tavares/Sutula had extended on his lot from the beach walkway to what Tavares/Sutula claimed was the actual entry point at the point of the ravine, ie the “lower pathway entrance.” That is shown on Exhibit No. 2 as “1993 recut by Sutula 2001.”
It also depicts the fifteen-foot wide walkway easement as depicted on the original Land Court Plan No. 20774G when it was recorded. It is labeled as “E,” Land Court and Proposed Pathway, on Exhibit No. 2.
Again, it is readily apparent from this plan that the beach walkway easement established by Tavares /Sutula and used by both Tavares/Sutula and the Streckers and their respective families and friends is substantially outside of the fifteen-foot wide deeded easement area referred to in Land Court Plan No. 20774G, in that, the actual path on the ground is serpentine in nature and although following the general course of the original deeded grant, crosses the deeded easement area as shown on Land Court Plan No. 20774G on two occasions, but eventually proceeds to the beach area. The best estimate, in reviewing in the plan, suggests that perhaps as much as ninety-five percent of the actual walkway is not built within the deeded easement area as shown on Land Court Plan No. 20774G.
On March 14, 2006, after the Streckers had constructed the “lower pathway entrance,” the Streckers filed smother N.O.I. with WTCC for purposes of constructing and relocating a new beach walkway to the beach on Tavares’ Lot No. 17 so as to locate it entirely within the deeded easement area as shown on the Land Court Plan No. 20774G, that is within the “E” Land Court Proposed Pathway. Mary Tavares, the record owner of Lot No. 17, was not a petitioner. The WTCC requested a legal opinion, which was rendered by Town Counsel, indicating that the Streckers, who are not the actual owners of Lot No. 17, even though they had an easement right on Lot No. 17, could not proceed on the N.O.I. without Mary Tavares as Trustee being a petitioner along with the Streckers. Furthermore, on March 27, 2006 Tavares/Sutula objected to the N.O.I. filed with the WTCC by the Streckers on a number of grounds, including but not limited to the fact that Tavares owned Lot No. 17, and that the Streckers had no legal authoriiy to petition the WTCC *706 without the assent of Tavares; that an action was pending in the Superior Court in regard to the same issue; and that the N.O.I. filed by the Streckers was in violation of the Order of Garsh, J.
On April 26, 2006, the same case, Dukes County Docket No. DUCV2002-00044, came before the Court, Kottmyer, J., for trial. The parties entered into an Agreement for Dismissal and agreed to dismiss the action. A Nisi Dismissal was entered with an agreement or stipulation to be filed on or before June 26, 2006. On April 25, 2007, the matter again came before the Court, Kottmyer, J. on an Emergency Motion to Vacate the Order for Entry of Dismissal which was allowed.[32]
On May 15, 2006, the WTCC denied the N.O.I. previously filed by the Streckers on March 14, 2006, on the grounds that it was administratively incomplete because the property owner, Tavares, objected to the proposed activliy on the property and would not provide written permission required under 310 CMR §10.05(4)(a).[33]
As a result of all of these activities between the Streckers and Tavares/Sutula the various lawsuits which are the subject matter of these two easements were commenced and constitute the matters for dispute before this Court.

DISCUSSION AND RULINGS OF LAW ON THE ISSUE OF FUSION

I. Fusion

Pursuant to Mass.R.Civ.P. 42(a), the Superior Court has broad discretion to fuse or consolidate cases involving a common question of law or fact. See Lumiansky v. Tessier, 213 Mass. 182, 187, 189 (1912); Nautican Realty Co, Inc. v. Nantucket Shipyard, Inc., 28 Mass.App.Ct. 902, 903 (1989). When several cases are tried together, fusion, as opposed to consolidation, enables the court to render a single judgment which negates the individual identity of each case by fusing or combining all the cases together as one. Lumiansky, 213 Mass. at 189. While the Supreme Judicial Court has stated that it is “more appropriate to . . . [fuse] .. . the cases before trial,” fusion is appropriate post-trial provided no harm will result to the parties. A.J. Wolfe Co. v. Baltimore Contractors, Inc., 355 Mass. 361, 370, 371 (1969); see Nixon v. GMC, CA No. 2000-1123 (Middlesex Super.Ct. Aug. 24, 2000) (van Gestel, J.) [12 Mass. L. Rptr. 290] (denying motion for fusion of cases before jury trial because of potential confusion).
Given the nature and posture of these various cases, at the time of closing arguments, this Court invited counsel to address the issue of “fusion,” particularly in light of the fact that these various cases involve two different court departments, the Land Court and the Superior Court. Counsel for Streckers and Tavares/Sutula requested the opportunity to submit a memorandum. Both did so. Both consented to fusion.
Fusion is most appropriate when it will reduce judicial costs, increase court efficiency, and preserve judicial resources. In this situation, there are multiple cases in two court departments each with multiple issues, and fusion will simplify matters for all the parties and for any appellate courts if the parties choose to engage in an appellate process.[34]
Most importantly, SMF is a party to only one of the actions, Land Court Docket No. 04SBQ20774 05 001, in which action all of the parties, the Streckers, Tavares, and Tavares/Sutula are also parties. Fusion is the only method to “draw in SMF ”to address all of the issues to which SMF is a very integral parly because of the Conservation Restriction; and to “draw in SMF” on any and all cases out of which an appeal may arise, to which SMF is also an integral party because of the Conservation Restriction. Furthermore, it is apparent to the Court that failure to fuse the cases would in all likelihood create a substantial potential for much more confusion, not only in issuing the Judgments, but particularly in an appellate process, if any. Perhaps of more significance is that these cases center around Land Court registered land. It would seem most appropriate for the Land Court, which court has the most interest in registered land, to ideally be the sole court to deal with all the issues raised by the parties so as to have one unified forum, instead of a split forum.
For the foregoing reasons, and with the concession of both parties on the issue of “fusion,” this Court hereby fuses all the aforementioned cases into the first Land Court case, Land Court Civil Action No. 04SBQ20774 05 001. Therefore, Dukes Superior Court Civil Action No. 2002-00044, Land Court Civil Action No. 04SBQ20774 05 001, Land Court Civil Action No. 06MISC330647 SCHEIER, and Dukes Superior Court Civil Action No. 2007-00011 and any related contempt actions shall be fused into a single action under Land Court Civil Action No. 04SBQ20774 05 001, which caption is the lead caption on this Memorandum of Decision, and will be the only caption after all cases are fused.
The Order of Chief Justice Mulligan ordered that the three matters referred to in his order remain separate, pending in different departments, and that findings as may be appropriate as well as a judgment are required in each action. The Chief Justice clearly suggested by his Order that, as consolidated cases, separate findings and separate judgments be entered in each case. However, the Order of the Chief Justice does not preclude “fusion” of the cases, which is a rare and extraordinary method of dealing with cases which uniquely fall within the arena where “fusion” is appropriate. “Fusion,” in its own right, also allows a finding and judgment in each case, or cases, that are fused into one and this Court concludes that a “judgment of fusion” would comply with the Order of the Chief *707 Justice that separate judgments be entered in each case.
Chief Justice Mulligan’s Order refers to only three cases by docket number. Both complaints for contempt emanate out of one of those docket numbers, the original Superior Court Action Docket No. 2002-00044. The last case, Dukes County No. 2007-00011 emanates from the Land Court Docket No. 06MISC330647 SCHEIER and this Court therefore considers all of the various actions to clearly fall within the intent of the Interdepartmental Order of Chief Justice Robert A. Mulligan.
The Court will therefore “fuse” all pending actions into the action titled William Strecker and Nancy W. Strecker, Plaintiffs v. Mary Tavares as She is Trustee of RFS Realty Trust and Francis Sutula, Defendants, and Sheriffs Meadow Foundation, Interested Party. Land Court Civil Action No. 045BQ20774 05 001.

DISCUSSION AND RULINGS OF LAW ON THE ISSUE OF THE VARIOUS EASEMENTS AND CLAIMS TO EASEMENTS AND THE CONTEMPTS

II. The Easements in General

An easement is an interest in land which grants to one person the right to use or enjoy land owned by another, Baseball Publishing Co. v. Bruton, 302 Mass. 54, 57, 58 (1938); Murphy v. Olsen, 63 Mass.App.Ct. 417, 420 (2005). Generally, when interpreting the meaning of a deed (or in this case other and all related documents), the court looks to the intent of the grantor as evidenced by “the words used in the written instrument[s], construed when necessary in the light of the attendant circumstances.” Sheftel v. Lebel, 44 Mass.App.Ct. 175, 179 (1998), (citing J.S. Lang Engr. Co. v. Wilkings Potter Press, 246 Mass. 529, 532 (1923); Suburban Land Co. v. Billerica, 314Mass. 184, 189, 190 (1943); Barchenski v. Pion, 9 Mass.App.Ct. 896 (1980)); see Haugh v. Simms, 64 Mass.App.Ct. 781, 786 (2005) (considering all the attendant factors including the language in the deeds, the purpose behind purchasing the land, the grantors’ previous use, and the relationship between the two landowners). The same principle applies to the interpretation of an easement created by a conveyance, “the extent of the easement ... is fixed by the conveyance.” Sheftel, 44 Mass.App.Ct. at 179 (internal quotation and citations omitted); see McLaughlin v. Selectmen of Amherst, 422 Mass. 359, 364 (1996). Further, phrases from the grantor’s language should not be read in isolation from, but in context, with the entire instrument (or in this case, instruments). Sheftel, 44 Mass.App.Ct. at 181 n.8.
It is clear that Goethals’ intent was to have only one driveway easement and only one beach walkway so as to minimize the environmental impact on both properties and to preserve the integrity of the open land for both lots through the course of the lots’ eventual development.
A. The Driveway easement
Pursuant to the restrictions of the Town of West Tisbury, Goethals established a single driveway for Lot Nos. 17 and 18. The plan submitted to the Land Court includes the driveway easement entering from Lambert’s Cove Road. The easement is shown on the plan as twenty feet wide.
The three instruments which relate directly to the driveway easement are the following; first, Goethals’ grant of a Conservation Restriction to SMF; second, the deed from Goethals to Tavares; and third, the Common Driveway Agreement which was executed by Goethals and Tavares to establish the rights of both parties to the common driveway and the rights of subsequent owners. The Common Driveway Agreement was recorded with the deed for Lot No. 17 to the Streckers. It included language such that “(n)either party shall cause the common portion of the driveway to be widened beyond its present width." At the time the Agreement was entered into the actual driveway as built within the twenty-foot-wide easement area was ten feet wide from Lambert’s Cove Road to the culvert, and the width of the actual driveway is so limited by the Order of Conditions of WTCC issued to Goethals.
Land Court Plan No. 20774G and the Common Driveway Agreement, the latter signed by both Goethals and Tavares so as to clarify the driveway easement referred to in the Tavares Deed, as well as the Tavares Deed, all specifically referred to a “Driveway Easement 20’ Wide.” It is clear from the instruments that Goethals intended and that Streckers are allowed use of the full twenty-foot-wide easement for travel and for all purposes for which public ways are used in the Town of West Tisbuiy. The only limitation to the Streckers is that the actual driveway that was to be constructed be physically only ten feet wide on the ground. That limitation in no way precludes their right to use the full easement, which is twenty feet wide from Lambert’s Cove Road to the boundary of Lot No. 18 for all purposes for which public roads are used in West Tisbuiy.
It is clear from the Land Court Plan that the original driveway easement as cleared by Tavares/Sutula was approximately two-thirds of the way into Lot No. 17, extending just past the culvert, a distance of approximately three hundred feet. Then the clearing for the driveway easement, as cleared by Sutula, truncated southwesterly, out of the actual proposed easement area as shown on Land Court Plan No. 20774G, and extended to the property line of Lot No. 18. This resulted in a shortened distance to the cleared easement area of approximately 165 feet. Had the driveway easement been constructed by Tavares/Sutula within the deeded easement area as shown on Land Court Plan No. 20774G, the distance would have been substantially more from the culvert to the boundary of Lot No. 18, a distance of approximately 300 feet, or ap *708 proximately 135 feet more that Tavares /Sutula would have had to clear and construct. Common sense suggests that the clearing and construction of the shorter driveway easement by Tavares/Sutula constituted a substantial saving to him in the cost of construction or clearing of the driveway easement area by making it 135 feet shorter than shown on Land Court Plan No. 20774G.
The language of the driveway easement is not ambiguous and the purpose for which it was created is clear. The grantor, Goethals, created a single twenty-foot-wide driveway easement for Lot Nos. 17 and 18 to comply with Town restrictions and to preserve the integrity and character of the naturally wooded and spacious area. For that reason, Goethals created the driveway easement as shown on Land Court Plan No. 20774G, which at present is the new location where it currently lies as constructed by the Streckers, that is the “post 2003 driveway” as depicted on Exhibit 1.
Tavares/Sutula are both knowledgeable, well educated and sophisticated people, as are the Streckers. Tavares and Sutula both knew the intention of Goethals when he divided the lots and set up both of the easements. Tavares/Sutula were integral players with Goethals when working with the WTCC to set up the Conservation Restriction. Goethals and Tavares also executed the Common Driveway Agreement to clarify the driveway easement referred to in the deed to Tavares. Before the conveyance to the Streckers, Tavares/Sutula knew or should have known that whatever encumbrances were placed on their land would be binding not only upon them, Tavares/Sutula, but upon Goethals and then any successors in title to either Goethals or Tavares. In regard to Goethals, the Streckers became his successors in title to Lot No. 18. All are bound by the various documents of record and in particular, the Conservation Restriction, the deed to Tavares, the Common Driveway Agreement, and then the deed to the Streckers.
This Court rules that Tavares, as record title holder, and Tavares/Sutula as beneficiaries of the RFS Realty Trust, are bound by the terms of those instruments, as are the Streckers, who are the successors in title to Goethals on Lot No. 18. The driveway easement had no “wiggle room” by virtue of the language of all the instruments taken together. The driveway easement is specifically referred to in all of the documents as the driveway easement as shown on Land Court Plan No. 20774G.[35] Tavares, as Trustee and owner of Lot No. 17, and Tavares/Sutula who are the beneficial owners of the RFS Realty Trust, and Sutula, acting as agent for Tavares, knew by the instruments that they were bound by the instruments of record, the Conservation Restriction, the conveyance to Sutula’s wife as trustee (the deed), and the Common Driveway Agreement executed by Tavares, Trustee, and that there were serious and longstanding obligations imposed upon them in regard to the driveway easement not only in regard to the owners of Lot No. 18, but also to SMF.
Notwithstanding, Tavares (and Tavares/Sutula) ignored those obligations. Tavares, as trustee, and Tavares/Sutula as beneficial owners of the trust, refused, failed or neglected to retain the services of an engineer to stake out the driveway easement to insure that it was properly located in the specifically defined area shown on Land Court Plan No. 20774G. Tavares allowed, conceded or cooperated with her husband Sutula in letting him lay out the driveway where he wanted it, truncating the driveway easement southwesterly away from the easement depicted on Land Court Plan No. 20774G resulting in (a) a driveway easement 135 feet less than Sutula would have had to construct to Lot No. 18 if constructed within the deeded easement as shown on Land Court Plan No. 20774G, thus reducing the cost of clearing the easement area; (b) preservation of a large oak tree which Sutula wished to preserve for aesthetic purposes; (c) an increase in the value to Tavares’ home, in Sutula’s opinion, by having the driveway more at a distance from Tavares’ home; and (d) allowed Tavares to avoid the mislocation of the well by Sutula in the center path of the driveway depicted on Land Court Plan No. 20774G.
Tavares and Tavares /Sutula knowingly and wilfully placed the location of their driveway where they wanted it, to their best advantage and to the total disregard of the record title holder of Lot No. 18 and the total disregard of the instruments of record, that is Land Court Plan No. 20774G, the Conservation Restriction and the deed to Tavares. They also had a total disregard of their obligations to SMF. They did so at their own risk.
The issues relating to the common driveway did not implode until after the issues relating to the walkway easement imploded, which will be discussed hereinafter.
By virtue of Tavares/Sutula’s notices to Streckers, the Streckers, the successors in title to Goethals of Lot No. 18, and subsequent future owners of record who would have to comply with the three previously mentioned documents, were given notice that the use of the pre-2003 driveway was outside of the deeded easement plan shown on Land Court Plan No. 20774G and that continued use would constitute a trespass for which they would be prosecuted. Streckers, concerned not only to their title, but successor title owners of Lot No. 17, opined that they would be criminally prosecuted for trespass or precluded from access to their year-round home and access to the beach. Streckers therefore applied to the WTCC to relocate the driveway so as to place it within the deeded easement area as shown on Land Court Plan No. 20774G. The application was opposed by Tavares/Sutula but the application was ultimately approved. Tavares/Sutula appealed administratively *709 and did not prevail. They never pursued the appeal in court. Consequently, the Streckers reconstructed the driveway so as to relocate it into the deeded easement area as shown on Land Court Plan No. 20774G.
Although there was testimony by Tavares/Sutula that they believed that the beach walkway easement was within the walkway easement as shown on Land Court Plan No. 20774G, there was no such testimony in regard to the driveway designed by Sutula and constructed by Tavares/Sutula. The Court therefore finds that Tavares/Sutula intentionally and knowingly constructed the driveway to their own advantage and to the disadvantage of both Goethals, the then owner of Lot No. 18, and all subsequent record title holders of Lot No. 18, at present the Streckers and that the actions of Tavares/Sutula were in disregard of their legal obligations established by the instruments of record.
Now, after litigating the issue at length, and after the relocation of the driveway by the Streckers, Tavares/Sutula wish to have the driveway relocated back to the “pre 2003" location, and concede that if moved, they will then allow the Streckers to use it.
This Court has considered the grants in question, the Conservation Restriction, and the Tavares’ deed and the Common Driveway Agreement. It has considered the intent of the grantor Goethals and the acceptance of the documents by the grantee Tavares. The Court has also considered the words used in the instruments, and the language construed in light of the attendant circumstances: (a) language; (b) purpose; (c) use; (d) relationship of the landowners (Goethals vis a vis Tavares); (e) the easements fixed by the instruments of record; and (f) the grantor’s language not in isolation but in context with the entire group of instruments.
The request by Tavares/Sutula to now return the driveway to the “pre 2003 driveway” is absurd and contravenes the total overall intention of Goethals as well as the action of Tavares/Sutula throughout this complicated litigation process. The land involving the driveway easement has been brought to war and laid to waste due to the actions of Tavares/Sutula who put their private interests ahead of those of Goethals, whose intent was to preserve pristine land.
This Court concludes that the common driveway shall be established as it presently lies within the deeded easement area as shown on Land Court Plan No. 20774G, the “post 2003 driveway,” and shall be binding upon the heirs, successors and assigns of Tavares/Sutula and the Streckers. The use of the twenty-foot driveway easement and the ten-foot-wide driveway constructed within that easement shall be controlled by the instruments of record, without any further amplification needed by the court other than the fact that the easement itself is twenty feet wide; and the actual driveway as constructed within the easement is limited to ten feet wide on the ground. Those having a right to use the easement have a right to use the twenty-foot-wide easement even though the actual driveway is limited to only ten feet by virtue of the Order of Conditions of WTCC. That twenty-foot driveway easement is allowed to be used by owners of Lot No. 18 for all purposes that public ways are used in the Town of West Tisbuiy.
This Court also finds that an easement was given to Commonwealth Electric Company by Tavares as record title holder of Lot No. 17. At the time that it was granted, the driveway had already been established and laid out and constructed on the ground by Tavares/Sutula as the “pre 2003 driveway.” It was incorrectly established by Sutula. The utilities are located in some instances within the deeded driveway easement as depicted on Land Court Plan No. 20774G, but in many instances within the “pre 2003 driveway” and therefore not totally within the boundaries of the deeded driveway easement as shown on Land Court Plan No. 20774G. This resulted because the utility company followed the “pre 2003 driveway” improperly installed by Tavares/Sutula. This mislocation may veiy well have had an adverse effect upon the record title holders of Lot No. 18, the Streckers, but more particularly future record title holders of Lot No. 18. This Court concludes that in order to protect all parties, especially the present owners of Lot No. 18, the Streckers, but more importantly the future record title holders of both Lot Nos. 17 and 18, that all utilities from Lambert’s Cove Road to the boundary of Lot No. 18 need to be relocated within the deeded easement driveway as depicted on Land Court Plan No. 20774G, the “post 2003 driveway.” The cost of the relocation shall be borne solely by Tavares, the record title holder to Lot No. 18, the parly who knowingly and intentionally caused the mislocation problem when the “pre 2003 driveway” was designed and laid out by Sutula.

B. Walkway Easement to the Beach

Goethals originally created the walkway easement on paper over Lot No. 17 beginning at approximately the midpoint of Lot Nos. 17 and 18 and extending to the beach area, by having his engineer craft Land Court Plan No. 20774G. The purpose and intent of Goethals regarding the walkway easement was to allow Goethals, and subsequent record title owners of Lot No. 18, to have access to the public beach area owned and maintained by the Town of West Tisbury. Goethals determined that a separate pathway over Lot No. 18 was not practical because of the physical characteristics of Lot No. 18, ponding area in the wetlands portion of the lot, the configuration of the dunes, and the overall impact on the environmentally sensitive area consisting of Lot No. 18.
Documents filed in the Land Court after Land Court Plan No. 20774G was filed substantially affect and define the beach walkway easement. For purposes of the walkway easement, Goethals’ grant of a Conservation Restriction to SMF is the most significant. The *710 Conservation Restriction provides in pertinent part: “. . . ^Installation, maintenance and use of a pedestrian trail including necessary bridges and boardwalks, between the Building Zones and the beach over Easement Zone ‘A,’ approximately as shown on the sketch plan (Exhibit A) and as approved in writing by the Grantee [SMF].” (Emphasis added.)
It is clear from the facts of the case, and in documents of record, that the purpose of the Conservation Restriction was to preserve a majority of the premises of both Lot Nos. 17 and 18 as open space and woodlands, and to preserve the rural nature of the area. There is no evidence before the Court that SMF ever approved the walkway, in writing or otherwise.
The walkway easement, as originally installed by Tavares/Sutula, followed a general course as that outlined on Land Court Plan No. 20774G. However, it meandered in a serpentine manner parallel to, and on occasion crossing over, the deeded walkway easement as shown on Land Court Plan No. 20774G, but substantially outside of the deeded walkway easement as shown on Land Court Plan No. 20774G.
Similarly to the driveway easement, in creating the walkway easement, Goethals’ primary concern was to preserve the integrity of the surrounding environment. Goethals created the Conservation Restriction to protect the wetlands area. Sutula worked with Goethals to develop the Conservation Restriction. Over the past several years, the WTCC has continually emphasized to both Streckers and Tavares/Sutula that any modifications and alterations to the land require the appropriate permitting, that the restriction is in effect to protect the wetland area, and that changes to the easements will impact this wetland area.
Tavares/Sutula ask this Court to mandate the creation or re-clearing of an additional walkway, one for each lot, so that the parties will not have to interact with one another and Tavares/Sutula will then regain their privacy. Tavares/Sutula seek to have use of the existing beach walkway shown as “C” and “F” on Exhibit No. 2. They also seek to have Streckers establish a new walkway, located within the actual boundaries of the fifteen-foot walkway easement shown on Land Court Plan No. 20774G, and shown as “E” on Exhibit No. 2. Tavares/Sutula also seek to have the Court declare the entry point to the Streckers’ section of the easement to be fifty feet below (towards the ocean) from the original concrete bound, the “lower pathway entrance.”
The Streckers, on the other hand, ask this Court to keep the walkway in its current location: allow them to use the walkway from its original access point, the “upper pathway entrance,” which they traversed from 1996 through 1998, which then joins the “C” walkway to the so called “locker box”; and then allow their to utilize the “G” pathway on the down side of the dunes, and along the riverbed of Coca-Cola Brook.
In looking at the attendant circumstances in this case, it is very clear that Goethals’ intent was not to create two separate walkways leading to the beachfront. See Sheftel, 44 Mass.App.Ct. at 179. This would result in an additional burden to the land, and the record shows that the creation of two walkways is plainly impractical and inconsistent with the intent of Goethals as grantor of the Conservation Restriction. The language in the easement states that the maintenance costs concerning the pathway should be shared by both Lot Nos. 17 and 18. If Goethals had contemplated two separate walkways, he would not have referred to “a” pathway and would not have mandated the equal sharing of expenses. Haugh, 64 Mass.App.Ct. at 786 (consider the relevant language, the purpose behind purchasing the land, the grantors’ previous use, and the relationship between the two landowners). Taking all these factors into consideration, this Court finds that the walkway easement to the beach shall remain in its current location. To move the walkway, or even create two separate walkways, would only put further stress on that local environment which is precisely the type of situation Goethals intended to avoid by creating a single walkway to the beach and imposing the Conservation Restriction.
This Court concludes that the entry point to the beach path walkway shall begin at the “lower pathway entrance, ” fifty feet below the concrete bounds and fifty feet below the entryway that the Streckers used during the 1996 through 1998 period. This “lower pathway entrance” is the walkway that was cut by Sutula in 1993 and recut again in 2001. It shall also include the portion of the walkway recut by Sutula so as to allow access to the “C” pathway to the beach. It is also the location where the Streckers erected a bridge, with the permission of the town of West Tisbury, to connect their Lot No. 18 with the walkway as cut by Sutula. To create an origination point otherwise would contradict Judge Garsh’s 2002 Order and foster additional turmoil between the two parties. This entry point allows Tavares/Sutula to maintain their privacy. It utilizes an existing pathway without disturbing the environment and landscape, and it utilizes the improvements as made by the Streckers. It will conform to the objectives of the Order of Garsh, J., allowing Streckers not only access to the walkway shown on Land Court Plan No. 20774G, but allow use of the walkway to the beach for which Garsh, J. specifically provided. Most importantly, it will confirm the intent of Goethals in regard to the easement which he created.
In light of the attendant circumstances, namely the combative history between the parties, Judge Garsh’s 2002 Order, and the existing recut path, the beach path easement shall begin fifty feet below the concrete bound. The Streckers shall then be allowed to traverse the pathway, as cut by Sutula in 1993 and again in 2001, which then joins the existing pathway the “C” pathway leading to the beach, and the “F” pathway to the right of the locker box and over the dunes. Even *711 though the existing pathway is located on the ground outside of the original easement as depicted on Land Court Plan No. 20774G, to move, alter, or create a new pathway would defeat the whole purpose of the Conservation Restriction and the creation of the pathway. Additionally, although the driveway easement was specifically defined as shown on Land Court Plan No. 20774G, the walkway was defined in very different terms, ambiguous at most, as “approximately as shown," but certainly not as definitively as the driveway easement.
In regard to the exit area from the pathway to the beach, all parties shall utilize the “F” path, to the right of the “locker box” as it is the pathway least sensitive to environmental impact.
This Court finds that the present location on the ground, as established by the Court, approximates the walkway easement as shown on Land Court Plan No. 20774G; was approved by Goethals by his acceptance of the one-half payment for installation, and is consistent with the intent of Goethals.

Summary of the Court

This Court therefore summarizes its action on the various complaints of all of the parties, which this Court will hereinafter fuse, and in doing so wishes to make clear the Court’s action taken on each of the numerous actions, counterclaims and cross actions and affirmative defenses pending in the various court departments:

Dukes County Superior Court Action Docket No. 2002-00044

(1) Amended Complaint of Strecker v. Tavares/Sutula: Count I, Declaratory Relief in regard to the easement to the beach — finding in part for the plaintiffs Streckers and in part for defendants also plaintiffs-in-counterclaim Tavares/Sutula; Count II, trespass by installation of fence — finding for the plaintiffs Streckers; Count III, breach of contract, implied covenant-^finding for the defendants Tavares /Sutula; Count IV, fraud and misrepresentation — finding for the defendants Tavares/Sutula; Count V, estoppel— finding for the plaintiffs Streckers; Count VI, destruction of trees and flora — finding for the plaintiffs Streckers; Count VII, declaratory judgment in regard to walkway and driveway — finding in part for plaintiffs Streckers and in part for defendants Tavares/Sutula.
On affirmative defenses raised by Tavares/Sutula failure to state a claim, estoppel, unclean hands and laches, the Court rules that the defendants have failed to substantiate any of the affirmative defenses. On the claim for attorneys fees under G.L.c. 231, §6F by Tavares/Sutula, the Court finds the action of plaintiffs Streckers not frivolous and denies the request for attorneys fees.
(2) On the Counterclaim of Tavares/Sutula v. Streckers: Count I, trespass on walkway entrance— finding for the plaintiffs-in-counterclaim Tavares/Sutula; Count II, trespass by driveway expansion — finding for the defendants-in-counterclaim Streckers; Count III, excessive use of driveway easement — finding for the defendants-in-counterclaim Streckers; Count IV, trespass on driveway and walkway easement — finding for the defendants-in-counterclaim Streckers; Count V, costs of driveway and walkway upkeep — finding in part for the plaintiffs-in-counterclaim Tavares/Sutula.
There are no affirmative defenses raised in the counterclaim by the Streckers.
(3) On the First Complaint for Contempt Tavares/Sutula against Streckers, the Court finds the defendant Streckers to be in technical Contempt of the Court Order of Garsh, J. dated August 6, 2002.
(4) On the Second Complaint for Contempt, a Summons shall issue, after which the Court will then schedule the matter for trial so as to accommodate the Court’s schedule. That contempt proceeding shall remain a totally separate matter so as not to prevent a judgment entering in the fused action hereinafter referred to.

In regard to Land Court 04SBQ20774 05 001:

(1) On the Complaint of Streckers v. Tavares/Sutula and SMF, as an Interested Party: on Count I, Declaratory Relief to Establish Walkway Easement as Built — finding for the plaintiffs Streckers and against defendants Tavares/Sutula and SMF; Count II, to Establish Driveway Easement — finding for plaintiffs Streckers and against the defendants Tavares/Sutula and SMF; Count III (no count alleged); Count IV, Establish Utility Easement in Driveway— finding for plaintiffs Streckers and against the defendants Tavares/Sutula and SMF. The Motion to Dismiss was filed by Tavares/Sutula. For the reasons previously stated the motion is DENIED. No response was required by SMF but an appearance was filed by counsel on its behalf and it shall therefore be deemed bound by this Memorandum of Decision and Judgment.

Land Court 06MISC330647 SCHEIER:

(1) On the Complaint of Tavares v. Streckers: Count I, Declaratory Judgment in regard to driveway location and use of driveway — finding for the defendants Streckers. The Motion to Dismiss is DENIED for reasons previously stated.

Dukes County Superior Court 2007-00011-A (absorbs LCA 06MISC330647 SCHEIER)

(1) On the Complaint ofTavares v. Streckers: Count I (the only Count) to relocate the driveway from the “post 2003 driveway” location to the “pre 2003 driveway” location — finding for the defendants Streckers. The Motion to Dismiss filed by the Streckers is DENIED for reasons previously stated.
On the affirmative defenses raised by Streckers: Failure to State a Claim, Administrative Remedies, *712 Vagueness, Laches, Moot, and Increased Burden, the Court finds that the defendants Streckers have not met their burden on the aforesaid affirmative defenses. On the affirmativedefenses of Justification, No Damages, Waiver, Wrongful Conduct of Spouse, Unclean Hands, Insufficient Survey, Inability to Establish Driveway, and Frustration this' Court finds that Streckers have met their burden against Tavares, and Tavares / Sutula.
On the Request for Attorneys Fees by Streckers under G.L.c. 231, §6F on the grounds that the Complaint was Frivolous, the Court finds the complaint of Tavares is frivolous and ALLOWS the Request for Attorneys Fees as against Tavares as Trustee and owner of Lot No. 18, and the proper party plaintiff and defendant-in-counterclaim, and against Sutula, in his capacity as a beneficial owner of the Trust.
(2) On the counterclaims of Strecker v. Tavares/Sutula: Count I, Declaratory Relief, Walkway and Driveway Easement and Permanent Injunction, the Court finds for the plaintiffs Streckers and against Tavares. The counterclaim against Sutula is DISMISSED by this Court for the reasons previously stated.

Streckers and Tavares/Sutula Vis-a-Vis Sheriffs Meadow Foundation

The Conservation Restriction requires not only Goethals, but Tavares, Tavares/Sutula and Streckers to give written notice to SMF; and to receive written approval by SMF for any of the following activities:
Cultivation and harvesting of forest products; selective clearing on Zone “A” for view enhancement for the houses; selective cutting appropriate for ecological management; activities designed to enhance the ecological or natural historical of the premises or to enhance the awareness of such values (e.g., create footpaths, boardwalks, and placing information signs . . .); installation, maintenance and use of a pedestrian trail over Zone “A” (approximately as shown on the sketch plan); protection of the barrier beach dune system via appropriate measures; using signs and fencing to preserve wildlife habitat.
There is no evidence of any written notice to SMF by any of the parties nor approval of any of the above given by SMF to any of the parties. No evidence of any written approval of record is problematic, not only for Tavares and Streckers as current record title owners, but even more so for the respective heirs, successors and assigns to both Lot Nos. 17 and 18. It becomes particularly problematic because neither party has sought, nor has SMF filed any Estoppel Certificate as provided for in the Conservation Restriction,[36] which would clearly resolve the issue for all present and future record title holders to both Lot Nos. 17 and 18.
The Conservation Restriction also requires Goethals as well as Tavares, Tavares/Sutula and Streckers to give written notice to SMF even when no written approval is necessary by SMF, for any of the following activities:
Installation, maintenance and use of a common driveway and underground utilities within the driveway right-of-way on Zone “B”; construction, use, maintenance, repair and replacement of a single family house and guest house on each lot, within the building zone; installation, use, repair and replacement of wells, septic systems, driveways, underground utilities and non-habitable structures, within the building zone; landscaping for residential use within the building zone, and any conveyance of the premises by both Goethals or successors in interest.
Again, there is no evidence before this Court of written notice to SMF by either Tavares as owner of Lot No. 17 or Streckers as owners of Lot No. 18 for any of the work which either of them did on their respective lots. This lack of any written notice is again problematic not only for Tavares and for Streckers but also for the respective heirs, successors or assigns for future owners of Lot Nos. 17 and 18.
By the terms of Paragraph eight of the Conservation Restriction, Goethals agreed to incorporate by reference the terms of the Conservation Restriction in any deed of divestiture, thus binding both Tavares and the Streckers, as well as their respective heirs, successors and assigns to both Lot Nos. 17 and 18.
Paragraph eleven of the Conservation Restriction requires that when approval by SMF is required, the owners of Lot Nos. 17 and 18 shall notify SMF in writing forty-five days prior to the undertaking of any such activities, describing in particularity the proposed work. There is no evidence before this Court that either party, Tavares or Streckers, complied with this provision.
Although there are sporadic occasions when SMF was on site on Lot Nos. 17 and 18, but on different occasions on those lots, there is no evidence before this Court that Goethals, Tavares, or the Streckers ever notified SMF in writing, or in any other manner, that work was being done on either of the two lots. In the chain of title at least as to future successors, heirs and assigns to Goethals, Tavares, or the Streckers, this could and in all likelihood will be veiy problematic.
SMF, now an Interested Party in this action, is now aware of the work that has been done to date on Lot Nos. 17 and 18 and referred to in the Conservation Restriction. It is also aware of the respective disputes between the parties evolving around the following:
(1) The location of the driveway over Lot No. 17 to Lot No. 18;
(2) The location of the electrical utilities in the driveway;
(3) The entranceway to the walkway to the beach for Lot No. 18;
*713 (4) The location of the walkway over Lot No. 17 for the use of both Lot Nos. 17 and 18 separate from the entranceway to the walkway;
(5) The location of the walkway over Lot No. 17 and through the dunes area to the beach.
SMF is aware of the provisions of the Conservation Restriction which require written notice to SMF and written approval by SMF for certain work done on the lots. It is also aware of the provisions which require written notice to SMF but do not require written approval by SMF. Although SMF does have enforcement powers under the Conservation Restriction, there is no evidence before the Court that SMF undertook enforcement action against either Tavares or Streckers; nor is there any evidence before this Court as to why SMF chose not to take any enforcement action against them for failure to comply with the Conservation Restriction.
This Court, by its findings, creates obligations between the present owners of Lot No. 17, Tavares, and Lot No. 18, the Streckers, and to their respective heirs, successors and assigns.
In regard to SMF only, these findings are conditional, in that it is not the obligation of the Court to determine the applicability of the Conservation Restriction vis-a-vis SMF and Tavares and the Streckers, as that approval rests solely with SMF as Grantee pursuant to the terms of the Conservation Restriction.
However, the Court does order SMF to review this Memorandum of Decision forthwith. SMF shall make a determination, without the influence of the findings of this Court, as to whether it agrees (a) with the findings of the Court; (b) with the work done to date by Tavares and by the Streckers on their respective Lot Nos. 17 and 18 (the construction of the respective homes and guest house; the relocation of the driveway by Streckers to the “post 2003" driveway location; and the establishment of the walkway to the beach), and all other matters to which SMF is entitled to receive notice and approve in writing, as well as those matters which SMF is to receive written notice, but is not required to approve in writing. If SMF determines that in its judgment the conclusion of the Court is correct and consistent with what SMF would approve within the context of the intent of Goethals and SMF when they entered into the Conservation Restriction, then this Court orders that SMF shall execute and deliver an Estoppel Certificate[37] within twenty (20) days from the date that this Memorandum of Decision is mailed to it, certifying that the Grantor (meaning Goethals, or his successors in title Tavares and Streckers), are in compliance to date, with the obligations of the Grantor (Goethals) contained in the Conservation Restriction. It shall be in a form recordable in the Land Court and shall be filed in this ’’fused" action within twenty (20) days of the date of mailing of this Memorandum of Decision.
In the event that SMF does not agree with the Court’s interpretation of the Conservation Restriction as to SMF, SMF shall file a Partial Estoppel Certificate noting on the Partial Estoppel Certificate, by exception, those portions of the Court’s interpretation of the Conservation Restriction with which it does not agree and indicate what remedial action shall be taken by either Tavares on Lot No. 17 or by the Streckers on Lot No. 18 so as to bring those respective lots into compliance with the Conservation Restriction. The Certificate shall be in a form recordable for the Land Court and filed in this “fused” action within twenty (20) days of the date of mailing of this Memorandum of Decision.
In the event that SMF files an Estoppel Certificate, that shall constitute an approval by SMF of all matters requiring written notice to SMF and written approval by SMF, as well as all matters requiring written notice to SMF but not requiring written approval by SMF, all as of the date of filing or recording of the Estoppel Certificate.
In the event that SMF files a Partial Estoppel Certificate, then all matters not excepted shall constitute an approval by SMF; and those matters excepted shall be remedied by the respective parties, Tavares, or Streckers, within ninety (90) days of the filing or recording of SMF’s Partial Estoppel Certificate. Thereafter SMF shall file an Estoppel Certificate as outlined above and if not so filed the matter shall then be set down for further hearing.

SUA SPONTE ORDER ON FUSION AND ORDER FOR JUDGMENT

All of the above cases which are pending in the Dukes County Superior Court and Land Court pursuant to the Order of Chief Justice Robert J. Mulligan are FUSED into one case and that case shall be reconstituted with the following caption and Docket Number:
COMMONWEALTH OF MASSACHUSETTS
DUKES COUNTY, ss. LAND COURT
NO. 04SBQ20774 05 001
WILLIAM D. STRECKER and NANCY W. STRECKER, Plaintiffs vs. MARY TAVARES as She is Trustee of RFS Realty Trust and FRANCIS SUTULA, Defendants and SHERIFF’S MEADOW FOUNDATION, Interested Party
The Clerks of the Dukes County Superior Court and the Dukes County Land Court shall not accept any papers filed by any party in any of the other pending cases unless filed in this fused case with the appropriate caption and docket number.
*714 The Clerk of the Superior Court is directed to enter as the last entry on all cases, and as a Judgment, except as to the fused case the following:

JUDGMENT

“No further action as FUSED with Dukes County Land Court Number 04SBQ20774 05 001. No further pleadings shall be accepted in Dukes County Superior Court Docket No. DUCV2002-0044, and the First and Second Complaints for Contempt filed with this action; Dukes County Land Court Docket No. 06 Misc. 330647 Scheier; or Dukes County Docket No. DUCV 2007-00011. All further pleadings shall be filed in Dukes County Land Court Docket No. 04SBQ20774 05 0001."
The Court by this Sua Sponte Order recapitulates its action on each of the separate complaints which have been filed and summarizes its actions on the complaints, counterclaims, and contempts and affirmative defenses all of which will be incorporated into the FUSED case in the form of the following Fused or Single Judgment.

ORDER FOR JUDGMENT IN FUSED CASE

In the FUSED Land Court Case Docket No. LC 04SBQ20774 05 001 the Court ORDERS the following Judgment to enter:[38]
Judgment in Regard to Driveway Easement
Judgment shall enter in regard to the driveway easement to be used by Lot Nos. 17 and 18 from Lambert’s Cove Road which shall establish the attendant easement rights and obligations of the parties to these various actions in regard to the use of the driveway and shall be binding upon Tavares/Sutula, the Streckers and upon their respective heirs, successors and assigns to Lot Nos. 17 and 18.
(1) The driveway is established as a matter of law as the so-called “post 2003 driveway,” shown as “B” driveway on Exhibit No. 1, the same driveway easement as shown on Land Court Plan No. 20774G. The relief sought by Tavares/Sutula to relocate the driveway back to its original location, the “pre 2003 driveway,” is denied. The relief sought by Tavares/Sutula to further allow the development within the deeded easement area as shown as Land Court Plan No. 20774G is denied as that area by this judgment is determined to be the deeded easement driveway as shown on Land Court Plan No. 20774G and is now established as the common driveway for Lot Nos. 17 and 18.
(2) That portion of the “pre 2003 driveway” which is outside the deeded easement area as shown on Land Court Plan No. 20774G shall be deemed abandoned, and no longer used for driveway purposes. It shall simply revert back to the purpose, or purposes, construed in the instruments of record.
(3) The use of the “pre 2003 driveway” by the Streckers does not constitute a trespass. The expansion or location of the driveway by the Streckers from the “pre 2003 driveway” to the present location within the boundaries of the twenty-foot-wide driveway easement as shown on Land Court Plan No. 20774G, and referred to as the “post 2003 driveway” does not constitute a trespass by Streckers on the land of Tavares, either past or continued, and does not constitute a trespass on the driveway easement. The rights of the common driveway are established by the instruments of record and more particularly the Conservation Restriction which provides for a common driveway “for all vehicular purposes that a public way may be used” to which this Court rules the parties to the action are bound. The easement itself is twenty feet wide, and the driveway as constructed within that twenty-foot-wide easement is limited to ten feet. The latter limitation shall in no way limit the remaining rights of Streckers within the twenty-foot-wide easement.
(4) No costs of maintenance of the driveway were submitted to the Court by Tavares/Sutula and damages are therefore denied in that regard. No evidence of damages was submitted by Tavares/Sutula as to the loss of value of the use of their home and no evidence of the value of any loss of trees was presented to this Court, and therefore damages in regard to all is denied.
(5) The underground utility lines which were installed in 1993 were installed by Commonwealth Electric Company from Lambert’s Cove Road to the boundary of Lot No. 18 substantially within the “pre 2003 driveway” as shown on Exhibit No. 1 which was laid out and established by Sutula. Some portions, including the transformer, are outside both the “pre 2003 driveway” and the “post 2003 driveway.” The Commonwealth Electric Company is to be contacted and instructed to relocate all the underground utilities, including the transformer at the boundary of Lot No. 18, so as to be totally within the boundaries of Land Court Plan No. 20774G, the “post 2003 driveway," and so as to comply with the easement granted by Tavares to the Commonwealth Electric Company. The burden of contacting the electric company and the cost of relocation shall be borne solely and exclusively by Tavares, record title holder to Lot No. 17. The relocation shall be completed on or before June 1, 2008.
(6) The Common Driveway Agreement provides that a prevailing party shall be awarded costs and attorneys fees. The Streckers have prevailed on the issue of the driveway. The Streckers shall within thirty (30) days of the filing of these Findings and Rulings submit the cost to relocate the driveway into the “post 2003 driveway” location. Those amounts shall be paid by Tavares/Sutula to the Streckers. If Tavares/Sutula seek to object to said amount, they shall do so within thirty (30) days of the Streckers’ filing, and the matter shall then be determined by *715 the Court or be set down for hearing so as to allow entiy of judgment.
(7) Tavares’ claim to relocate the driveway back to the “pre 2003 driveway” location from the present “post 2003 relocation” in this Court’s determination is a claim that is frivolous under G.L.c. 231, §6E, for the reasons previously stated. Streckers shall within thirty (30) days of the filing of these Findings and Rulings submit by affidavit a proof of claim for attorneys fees and costs on that portion related to the relocation of the driveway specifying by hours and tenths of hours the specific legal services related to it. The amounts shall be paid by Tavares/Sutula to Streckers. If Tavares/Sutula seek to object to said amount, they shall do so within thirty (30) days, of the Streckers’ filing, and the matter shall then be determined by the Court or set down for hearing so as to allow entiy of judgment.
(8) All other future costs to the maintenance of the “post 2003 driveway" shall be controlled by the Common Driveway Agreement and all related instruments of record. All other rights for use of the common driveway shall also be controlled by the Common Driveway Agreement and other instruments of record.
(9) All other relief sought by all parties in regard to the deeded driveway easement is denied.

Judgment in Regard to the Walkway Easement to the Beach

Judgment shall enter in regard to the entranceway from Lot 18 to Lot 17 for purposes of access to the beach walkway and to establish the beach walkway from Lot No. 18 over Lot No. 17 to the beach which shall be binding upon Tavares, Tavares/Sutula, and Streckers and their respective heirs, successors and assigns to Lot Nos. 17 and 18:
(1) Streckers shall use the “D” pathway as shown on Exhibit No. 2 attached hereto. It shall hereinafter be referred to as Lot No. 18 “Lower Pathway Entrance” which connects to “C” pathway as shown on Exhibit No. 2. In regard to the relief sought by Streckers for the costs to construct the footbridge on their property over the ravine on their property, the relief sought is DENIED.
(2) A Permanent Injunction shall issue enjoining the Streckers from entering Tavares’ property at the concrete bound or using the “Upper Pathway Entrance” or “Upper Pathway used by Streckers.” Their use of that pathway was foreseeable, but technically a trespass. That use was ultimately corrected by the Streckers’ efforts to construct the “lower pathway entrance” immediately after the issuance of the Preliminaiy Injunction by Garsh, J., and therefore nominal damages for trespass are assessed in that regard in the amount of $1.00.
(3) In regard to the “Sutula fence,” those fence posts installed by Tavares/Sutula located on the Streckers’ property, no matter how minimal the intrusion, constitute a trespass. No damages are assessed as there is no evidence of a measure of damages before the Court. However, Tavares and Tavares/Sutula are ordered to remove those posts forthwith which intrude to any degree on the Streckers’ property, Lot No. 18, and to do so at their sole expense, to be done on or before June 1, 2008.
(4) In regard to the claim of the Streckers against Tavares, as well as the claim of Tavares/Sutula against the Streckers, for violation of G.L.c. 242, §7, for destruction of trees, although there is some evidence of mutual destruction by each, there is no evidence as to the nature or extent of the destruction, nor is there any evidence before the Court as to monetaiy damages, and the relief is therefore denied as to damages.
(5) In regard to the request for declaratoiy relief in regard to the beach walkway expenses, they are to be shared equally between Streckers and Tavares. At the time of trial Tavares had expended the sum of $840.00. Streckers shall reimburse Tavares the sum of $420.00 representing one-half of the expenses to date. All future costs shall be shared equally pursuant to the terms of the Conservation Restriction and shall comply with all instruments of record.
(6) In regard to the declaratoiy relief seeking to establish the walkway or pathway to the beach beyond the Streckers’ footbridge, the “the Lower Pathway Entrance,” this Court hereby establishes the pathway to the beach from the boundary of Lot No. 18 to the beach as follows:
(A) The entrance shall be at the base of the Strecker footbridge, the “D” pathway or “lower pathway entrance” as shown on Exhibit No. 2, over the 1993 pathway cut by Sutula, and recut by Sutula in 2001, to the “C” pathway. From there the pathway to the beach is established as the “C” pathway to the so-called “locker box.” From the “locker box” location it shall truncate to the right, over the dunes, and to the beach (including through the buffer zone) or the pathway labeled “F” pathway as shown on Exhibit No. 2. The “C” and “F” pathways shall be the access pathway of both the' Streckers and Tavares/Sutula. Due to the vagueries of “mother nature,” the walkway to the beach shall hereinafter be controlled by the instruments of record, in consultation with SMF. The right to use the pathway or walkway is established as fifteen feet wide.
(B) The walkway shown on Land Court Plan No. 20774G as “E” and shown in blue on Exhibit No. 2 attached hereto is to be disregarded and dissolved as it is inconsistent with the intent of *716 Goethals’ approval of the pathway as built, and is inconsistent with his plan for the construction of only one pathway. The walkway as built is consistent with the Conservation Restriction, and is superseded by the preceding paragraph for the reasons stated in these findings.
(C)Tavares/Sutula claim for attorneys fees under G.L.c. 231, §6F in regard to the walkway is denied as Streckers’ claims are not without merit.
(7)In regard to both the deeded driveway easement and the so called “walkway” easement to the beach, upon the filing of an Estoppel Certificate or a Partial Estoppel Certificate by SMF as ordered herein, Streckers shall retain, employ or otherwise engage Vineyard Land Surveying, Inc. of West Tisbuiy, Massachusetts so as to have it update the August 5, 2002 plan, prepared for William and Nancy Strecker, so as to have it depict the following:
(A) The tweniy-foot-wide driveway easement area from Lambert’s Cove Road as shown on Land Court Plan No. 20774G, including the actual ten-foot driveway located within the twenty-foot easement, both shown by metes and bounds. Concrete bounds shall be set in the ground by Vineyard Land Surveying, Inc. at least eveiy 100’ from Lambert’s Cove Road to the boundary of Lot No. 18 so as to establish the limits of the tweniy-foot-wide driveway easement. No bounds need to be established as to the ten-foot wide driveway actually installed on the ground within the twenty-foot-wide easement.
(B) The fifteen-foot walkway, following the centerline of the walkway as presently constructed on the ground by Sutula by metes and bounds on the path established by the Court Le. the “lower pathway entrance,” the 2001 recut by Sutula, the “C” pathway and finally the “F” pathway to the beach. The walkway easement shall be depicted as fifteen feet wide. Concrete bounds shall be set in the ground at least every two hundred feet from the “lower pathway entrance” to the boundary of the town beach so as to establish the fifteen-foot walkway easement. The Streckers are entitled to full use of the fifteen-feet-wide easement pursuant to the instruments of record.
(C) The plan shall be prepared so as to be in recordable fashion acceptable to the Land Court. After it is prepared, SMF shall endorse “approved" on the plan if in fact it approves the plan. The plan shall include by metes and bounds the boundaries ofLotNos. 17and 18, the boundaries of the Conservation Restriction, the boundaries of the tweniy-foot-wide driveway easement, and the boundaries of the fifteen-foot-wide walkway easement. When the plan is complete, counsel for Streckers shall file in this “Fused” action a “Certification” that the plan has been completed, and a copy has been sent to counsel of record for Tavares.
(D) The cost of developing said plan shall be shared equally between the Streckers as owner of Lot No. 18 and Tavares as owner of Lot No. 17. If Tavares does not concur with the plan as developed, she shall be allowed to retain an engineer of her own choosing who will be allowed to submit a plan suggesting alterations to the Vineyard Land Surveying, Inc. Plan which shall be at her own expense. If Tavares chooses to contest or dispute the plan ás developed, she shall file in this action a “Notice of Dispute” as to the plan within twenty days of receipt of the “Certification” from counsel for Streckers, and if not so filed, Tavares shall be bound by the revised plan. If a dispute remains, the Court will then determine the establishment of the boundaries to which the parties do not agree.
(E) When completed the plan shall be registered with the Land Court, referring to this Judgment. After registered, and because of the vagueries of nature, the beach walkway shall then be controlled by the terms of the Conservation Restriction and other instruments of record in conjunction with SMF. All other terms of the Conservation Restriction shall remain in effect pursuant to the terms of that document.
(8) A Permanent Injunction shall issue against Tavares/Sutula enjoining them from interfering with the rights of the Streckers to use both the driveway easement and walkway easement pursuant to the terms of the instruments of record and this Judgment.
(9) All other relief sought by all parties in regard to the deeded walkway easement is DENIED.

Judgment in Regard to Sheriff’s Meadow Foundation

Judgment shall enter against Sheriffs Meadow Foundation as an Interested Parly as follows:
(1) Sheriffs Meadow Foundation shall file an Estop-pel Certificate or a Partial Estoppel Certificate within twenty (20) days upon notice of this finding by the Court. If SMF files an Estoppel Certificate as set forth in these findings, such certificate shall be conclusive as to the approval by SMF of all work done to date on Lot Nos. 17 and 18 as to all matters requiring written notice to SMF and requiring written approval by SMF; and other matters requiring written notice to SMF but not requiring written approval by SMF. In the event that a Partial Estop-pel Certificate is filed, the owner of the respective lot Nos. 17 or 18, as the case may be, shall comply with the remedial requirements and complete such remediation work within ninety (90) days so as to allow SMF to issue an Estoppel Certificate approving all remedial work.

They were previously represented by Sean E. Murphy, Esq.; Philip Y. Brown, Esq.; Brian M. Hurley, Esq.; and are now represented by Tyler E. Chapman, Esq.

Although Maiy Tavares as Trustee and Francis Sutula are referred to together throughout this memorandum it is clear that the record title holder to Lot No. 17 is solely Mary Tavares as Trustee of R.F.S. Realty Trust; and that Francis Sutula, individually, is not a record title holder. Therefore, throughout these findings Tavares/Sutula may be referred to simply as Tavares, or as Tavares/Sutula, or Sutula who at all times was acting on behalf of Tavares as an agent or representative, or as a beneficiary of the RFS Realty Trust. The RFS Trust was created in October 1992 by Tavares/Sutula. Tavares is the trustee and the beneficiaries of the Trust are both Mary Tavares and Francis Sutula.

As will be seen from the pleadings in the various actions, the pleadings became very problematic because in many instances the counts mixed the claims and in some instances were duplicative of actions pending among the two court department cases.

Reference will be made throughout this Memorandum of Decision to two plans utilized by this Court which are attached hereto and incorporated herein as though set forth in full and are marked Exhibit No. 1 and Exhibit No. 2, and will be more fully explained hereinafter. [Editor’s Note: The referenced Exhibits are not reproduced in the reported opinion.]

The original complaint was filed by Streckers, to which an answer, affirmative defenses and a counterclaim were filed by Tavares/Sutula; each being supplemented by an amended complaint and then an amended answer, affirmative defenses, and an amended counterclaim, the latter of which constitutes the amended complaint and amended answer and amended counterclaim considered by this Court as well as all affirmative defenses asserted by each of the parties. Streckers are plaintiffs, defendants-in-counterclaim, and defendants-in-contempt. Tavares/Sutula are both parties defendant, plaintiffs-iri-counterclaim, and plaintiffs-in-contempt.

As will be seen from the facts, there are two driveways involved in this case. The first was built by Tavares/Sutula on their own Lot No. 17 and shall be referred to as the “pre 2003 driveway”; and the second, a relocated driveway built by the Streckers, rebuilt on Lot No. 17 owned byTavares, and referred to as the “post 2003 driveway” to replace the “pre 2003 driveway” previously built by Tavares/Sutula. It was reconstituted by Streckers in order to replace the “pre 2003 driveway.”

Although the original 2002 complaint was filed before the installation of the “post 2003 driveway,” the amended complaint was filed in the latter part of 2003, and after the installation of the “post 2003 driveway,” and therefore references made in the Amended Complaint to the “post 2003 driveway.”

As will be seen hereinafter, another Land Court case, Land Court Docket No. 06MISC330647, followed the Transfer Order of Chief Justice Mulligan quite differently as it was assigned a separate Dukes Superior Court Docket No. 2007-0001. This second complete Land Court file became Paper No. 1 in the Superior Court Action No. 2007-00011. This second Land Court case will be hereinafter referred to. The docketing procedure followed in both actions is inconsistent, but will be dealt with as this Court finds them, and hereinafter administered by the Clerks of each of the Court Departments as each deems proper.

See the reference above to this Land Court case becoming Paper Number 41 in Dukes County Superior Court docket number 2002-00044 pursuant to the Interdepartmental Order of Transfer referred to on page 7 of this Memorandum as well as footnote 8 on the same page.

This is really just a complaint with a misnomer of Amended Supplemental Complaint, when in actuality it is simply a complaint. In this action SMF was named as an Interested Party, was served, and filed an appearance, and is therefore a fully constituted party to this particular action as an interested party.

As will be seen from the facts as they are developed SMF was named as an Interested Parly because it was the grantee of a Conservation Restriction, hereinafter referred to, and by the terms of the Conservation Restriction SMF was required to receive written notice of and to approve in writing certain elements of each easement, and in other instances be notified in writing of certain work, although no written approval is required.
For purposes of these findings, and under the terms of the Conservation Restriction, it is necessary for SMF to receive written notice of and to give written notice of approval for the following activities on Lot Nos. 17 and 18: Cultivation and harvesting of forest products. Selective clearing, on Zone “A" for view enhancement for the houses; Selective cutting appropriate for ecological management; Activities designed to enhance the ecological or natural historical value of the Lots, or to enhance the awareness of such values; Installation, maintenance, and use of a pedestrian trail over Zone “A” “approximately as shown on the sketch plan”; Protection of the barrier beach/dune system via appropriate measures; Using signs and fencing to preserve wildlife habitat; and Other activities consistent with the Conservation Restriction’s purposes.
The following activities require that SMF be given written notice, although SMF does not have to give approval: Installation, maintenance, and use of a common driveway and underground utilities within the driveway right-of-way on Zone “B”; Construction, use, maintenance, repair, and replacement of a single-family house and a guest house on each Lot, within the Building Zone; Installation, use, repair, and replacement of wells, septic systems, driveways, underground utilities, and non-habitable structures, within the Building Zone; Landscaping for residential use within the Building Zone; and Any conveyance of the Lots by Goethals or successors in interest.
This Court notes that Paragraph 11 of the Conservation Restriction provides in pertinent part as follows:
11. Notice and Approval with Respect to the Grantor's Activities. Whenever notice to or approval by the Grantee is required under the provisions of paragraphs 1 or 2, the Grantor [Goethals and his successors in title] shall notify the Grantee in writing not less than forty-five (45) days prior to the date the Grantor intends to undertake the activity in question. The notice shall describe the nature, scope, design, location, timetable and any other material aspect of the proposed activity in sufficient detail to permit the Grantee to make an informed judgment as to its consistency with the purposes of this Conservation Restriction. Where the Grantee’s approval is required, the Grantee shall grant or withhold its approval in writing within forty-five (45) days of receipt of the Grantor’s written request therefore. Failure to Grant or withhold within such 45 day period shall constitute automatic approval of the proposed activity. No approval called for shall be unreasonably withheld by the Grantee.

The only plaintiff in this action is Maiy Tavares as Trustee of RFS Realty Trust. Sutula is not a named party plaintiff. This fact has been referred to previously and will be referred to hereinafter.

This Interdepartmental Order will be more fully explained hereinafter.

Again, the only complaint is what is referred to as a Supplemental Complaint when in reality it is simply a complaint.

Francis Sutula was named as a Defendant-in-Counterclaim in this Dukes County Action No. DUCV2007-00011. Francis Sutula was not a plaintiff in this original Land Court Action No. 06MISC330647 SCHEIER, which was transferred to this Superior Court Action. He is not properly named as a Defendant-in-Counterclaim because he was not a plaintiff in this action. No request was filed to name him as a Third-Party Defendant, an Interested Party, or to implead him as a Party Defendant or a Third-Party Defendant. He was simply named as a defendant in counterclaim. There is no evidence that he was served in that capacity, or that service was accepted on his behalf in any capacity. Simply naming an unserved party as a party defendant with no other action, simply cannot be done under our rules of pleading. To the extent that Francis Sutula is named as a Defendant-in-Counterclaim, that is null and void and of no legal effect, and the counterclaim as to him is therefore dismissed, sua sponte, on the face of the pleadings.

This part of the Order of the Chief Justice will be addressed hereinafter in this Memorandum and Order at page 67 under the Discussion and Rulings on the issue of fusion.

The history relating to both lots is extremely important to establish the intent of the original grantor, Goethals, and the respective plans and instruments which were ultimately prepared by Goethals and recorded and filed.

In one sense the properties are waterfront properties. However, as will be seen by the facts as they develop, both lots are not direct waterfront properties. They each extend down to a strip of beach owned by the Town of West Tisbuiy to which each have access by virtue of being abutters. Therefore, although not directly waterfront properties, they are water view properties, with direct access to the public beach owned by the Town of West Tisbuiy.

The beach area, although public, was limited to only the residents of West Tisbuiy because of limited parking therefore making it a “de facto” limited public beach.

The brook is so named because as rain and subsurface water leaches through the ground and Goethals’ upland lot and drain out of Frog Pond, the water absorbs the nutrients in the surrounding terrain, transforming it from a clear color to a brown or Coca-Cola color.

Vineyard Open Land Foundation was a predecessor to SMF.

Even though the Order of the WTCC limited the driveway from Lambert’s Cove Road to the culvert to ten feet width, that does not affect the fact that the deeded easement area on Land Court Plan No. 20774G is twenty feet, and not ten feet. This fact will be referred to hereinafter.

In the Land Court, plans are initially assigned a number. The foundation number for the Goethals plan is 20774. As the plan is changed or modified, the number is then assigned a sequential letter, as occurred in this case. The plan therefore evolved from Plan No. 20774, to Plan No. 20774E and then to Plan No. 204774G (there is no evidence before this Court of a Plan No. 20774F).

G.L.c. 41, §8IP.

This is consistent with the variance for the driveway to the culvert issued by the ZBA which required that the actual driveway constructed within the twenty-foot-wide driveway easement be limited to a width of ten feet.

See p. 21, supra.

See p. 62, infra.

Had Sutula staked out the driveway within the boundaries of the Land Court Plan No. 20774G, the distance from the culvert to the boundary line of Lot No. 18 would have been approximately 300 feet.

Lawyer for Tavares/Sutula.

See fn.32, p. 65, hereinafter referred to, in regard to the history of the first trial.

(Emergency Motion to Vacate Order for Entry of Dismissal Nisi) after 10/19/06. “After hearing on 10/18/06, the Motion is ALLOWED because at the hearing the defendants withdrew their opposition to the motion expressing that the plaintiffs’ actions established that they would not cooperate in good faith efforts to implement the settlement. The Court believes that the plaintiffs did not exercise good faith in effectuating the settlement. Further, the Court is concerned that the plaintiffs entered into the settlement after the Court excluded testimony by an expert for failure to give notice and that they will attempt to obliterate the effect of that ruling at a new trial. Nonetheless, because defendants have withdrawn their opposition to the Motion to Vacate, it is reluctantly allowed. Kottmyer, J.”

This is inconsistent with the action taken by WTCC in regard to the relocation of the driveway, which the WTCC allowed as to the Streckers and was opposed by Tavares/Sutula, and approved even though Tavares was not a petitioner on that N.O.I. But this Court takes the facts as it finds them.

In this case, both parties, Streckers and Tavares/Sutula, concede that fusion in this case would be appropriate. This Court concludes that without fusion, the four primary cases and the contempt cases could all take various and different avenues after judgment enters. For example, in any case a party can file a motion for a new trial; a motion for stay of issuance of execution; an appeal of an issue in one case but not another (cherry picking); a motion for reconsideration and perhaps a panoply of other motions. If all filed at different times in the different cases, that could lead to a variety of multiple appeals with some on different timetables. To fuse these cases eliminates that possibility in the view of this Court and minimizes and perhaps even eliminates entirely any harm to any of the parties.

As will be discussed the language in regard to the beach walkway easement is not so specific and allowed much greater leeway or flexibility.

InJra, p. 87 fn37.

Paragraph 13 of the Conservation Restriction provides in pertinent part: “Estoppel Certificates. Upon request by the Grantor, the Grantee shall within twenty (20) days execute and deliver to the Grantor any document requested, including an estoppel certificate, which certifies the Grantor’s compliance with any obligations of the Grantors contained in this Conservation Restriction.”

(Caveat in regard to the Order for Judgment) Although these cases perhaps should have been resolved in a much different manner, they were not. This Judgment is ordered entered, not only for the litigants in this case, but more importantly for all of the successors in title to both Lot Nos. 17 and 18 who shall not be burdened with any further litigation, such as was carried on here.